Argued February 7; reversed April 10; rehearing denied
May 8, 1945

# EVANS *v.* EVANS
### (157 P. (2d) 495)

Before BELT, Chief Justice, and ROSSMAN, BAILEY,
LUSK and BRAND, Associate Justices.

*Robert E. Ellinwood,* of Portland, for appellant.

*William C. Palmer,* of Portland (Albert F. Knight,
of Portland, on the brief), for respondent.

ROSSMAN, J.

This is an appeal by the defendant from a decree of the circuit court in favor of the plaintiff which dissolved the marriage contract existing between her and the defendant, awarded to her custody of the two children of which the parties are the parents, and granted to her additional relief in the form of property rights and support money.

The complaint, after alleging that the parties were married in Pendleton June 24, 1934, charged the defendant with cruel and inhuman conduct. These averments, after accusing the defendant of "vicious" conduct and of the use of profanity, continue as follows:

> "Defendant herein has a cruel, domineering disposition and when in his fits of anger he becomes violently abusive and in these fits of anger has struck and beat this plaintiff, knocking her to the floor and beating her head on the floor after she was down."

The complaint specifies no details, times or places. The following averments are also contained in the complaint:

> "Plaintiff further alleges that during all of the married life of this plaintiff and defendant she has endeavored at all times to carry out the marriage contract existing between plaintiff and defendant, has been a faithful, loving and affectionate wife and has given the minor children of plaintiff and defendant kind, wholesome and loving care at all times, * * *. Plaintiff further alleges that prior to the marriage of this plaintiff and defendant she was the widow of Albert Smith, who died in the State of Montana in the month of April, 1932, leaving a minor child, Jacqueline Lee Smith, who will be thirteen years of age in May * * *. Plaintiff further alleges that she is a loving, consistent, affectionate mother * * *."

The answer denies all of the averments of the complaint which charge the defendant with the use of profanity and with cruel and inhuman conduct. It likewise denies the averments in which the plaintiff alleges that (a) prior to her marriage to the defendant she was a widow; (b) Jacqueline was the issue of a previous marriage; (c) the plaintiff after her marriage to the defendant was a loving wife; and (d) she was a dutiful mother. The answer seeks no affirmative relief.

We shall now review the evidence. Following their marriage and until the latter part of 1941, the couple made their home in Pendleton. Three children were born to them there, only two of whom were living at the time of the trial (June 26, 1944). At the time just mentioned one of the children, William, was nine years of age, and the other, Doris, was six years of age. Jacqueline, of whom the defendant is not the father, was thirteen years of age.

In September of 1941 the defendant came to Portland and entered the employ of a shipbuilding company as a welder. At the same time he purchased a home for the family and shortly thereafter the plaintiff and the three children came to Portland.

Four or five months after the family moved to Portland the defendant suffered an attack of jaundice which confined him to his home for more than a month. He swore that at that time he became concerned with his debts and that his wife, acting upon his suggestion, secured employment. The work which she secured was that of a night waitress in a restaurant. Her hours of employment were from 5:30 p. m. to 2:00 a. m. Later, they were changed and became 7:00 p. m. to 3:30

a. m., and at another time they were 11:30 p. m. to 8:30 a. m. The plaintiff testified:

> "I started to work at 5:30 to 2:00 and I usually worked overtime. If not, I went to the show that was open all night  *  *  *  and I worked from 7:00 to 3:30 and sometimes  *  *  *. Then I worked from midnight to 8:30. I would lots of times wait for the stores to open so I could do some shopping."

We now quote from the defendant's testimony:

> "Q. When did the difference between you and Mrs. Evans first become apparent?
>
> "A. I first noticed it when she began being from three to seven, eight or nine hours after she got off work, coming home."

Our reading of the evidence convinces us that the answer just quoted reflects the truth. In other words, we are satisfied that no trouble of any importance developed between the plaintiff and defendant until after she became a night waitress, and not even then until after she began a practice of coming home long after her work at the restaurant had been completed. We have not overlooked the part of the plaintiff's testimony in which she testified that while the couple lived in Pendleton the defendant bestowed too much attention at dances upon one of his partners. The name of this woman was not mentioned. We are convinced that, wittingly or otherwise, this incident assumed in the plaintiff's mind an exaggerated scale when she began to entertain plans for a divorce. We brush this incident aside as unimportant, and are convinced that when the family came to Portland it was a happy, harmonious group.

We have just stated that when the family came to Portland the household was a harmonious one. Al-

though the defendant was not the father of Jacqueline, nevertheless, after his marriage with the plaintiff, Jacqueline took the name of Evans and the defendant's attitude toward her was that of a father. We come now to the part of the record representing the plaintiff's testimony that the defendant administered beatings to her. Since she mentioned no dates nor attempted a chronological account, it is impossible to know the precise times when these incidents purportedly occurred. It is clear, however, that they did not happen until after she had taken employment in the restaurant and the defendant had repeatedly asked her to terminate it. The plaintiff specified only two occasions when she claims she was attacked by the defendant. In response to leading questions, and through the use of generalities, she indicated, however, that there were other attacks. The first time she was asked concerning one of the purported assaults the question ran as follows:

"You allege that the defendant has a cruel, domineering disposition * * * and in his fits of anger has struck and beat you * * *. Now, tell the Court about that."

Her answer began as follows:

"I was all ready to go to work one night. He insisted I wasn't going. It started in then."

It seems clear that the plaintiff's insistence upon working and the defendant's desire that she remain home were the cause of the difficulty to which she referred. The plaintiff's entire answer to the question just quoted follows:

"I was ready to go to work one night. He insisted I wasn't going. It started in then. He tore my dress and the next thing I remember I was on

the floor and he made my nose bleed, and he grabbed my hand and pulled my head up and down and hurt my finger. He had a cold cloth on my face afterward, but I went to work anyway.''

Then she was asked:

''Did you do anything to cause him to knock you out?'' (We observe that she had said nothing about having been knocked out). Her answer follows:

''He said he didn't want me to go to work.'' It seems clear that the plaintiff's insistence upon working caused that fracas, being the first which she mentioned. Shortly the plaintiff was asked:

''Do you recall any other times he struck you?''

Her sole answer was:

''All last summer and winter it has been nothing but that. It always ended up that way. He tore my bathrobe off of me one morning.''

The plaintiff next testified concerning matters alleged in the answer and the handling of the children. She said nothing more about assaults upon her until she was questioned on cross-examination upon that subject. The question then asked was:

''When you allege that he attacked you, hit your head on the floor * * *.''

Her answer started thus:

''I was standing holding my head. He said, 'You aren't going to work tonight.' I said, 'Yes, I am.' He said, 'You are not; I will knock you out first.' I said, 'No, I don't think you will.' After all, a wife has a few privileges * * *.''

Thus, again, she stated that her insistence upon working was the cause of the trouble.

The plaintiff gave no further testimony in support of her charges of violence until after the defendant had given his testimony and she had resumed the witness stand. She then referred very briefly to an occasion when "he gave me a black eye." Although the plaintiff claimed that her mother, while living in the Evans' home, noticed that she had a discolored eye, the mother was not called as a witness. The record contains no explanation whatever of the plaintiff's failure to call her mother. The sole witness produced by the plaintiff was a Mrs. Dunlap, who swore that while the Evanses lived in Pendleton the plaintiff was a dutiful wife and a good mother. We know nothing about Mrs. Dunlap, not even her first name.

The only testimony which the plaintiff gave in support of her charge that the defendant called her profane names is the following:

"He called me a chippy and a whore in front of my babies, then explained it to them and insisted he would not take them any place and especially the restaurant, because nothing but chippies worked there, and I was employed there at that time."

Thus, again, we see that the plaintiff's indictment of the defendant was closely connected with and arose out of his objections to her employment.

We now come to the defendant's testimony. He swore:

"I have refrained from using any vile language around any of the children. The only time I ever used any at any time was when she, by these things she has done, had me so upset, threatening me continually, that I perhaps have during that time, and that is all. Any other time I have always taught the children never to use bad language."

We are satisfied that the plaintiff herself used profane language and that she did so at times in the presence of the children. Only those who have taken themselves sufficiently in charge so that they have bridled their own tongues are in a position to criticize unbridled tongues.

The defendant denied that he ever struck his wife. We are satisfied that the defendant's efforts to persuade his wife to quit her employment and take care of her family resulted in arguments. In their course he urged her to secure day employment, if she felt that she had to work, so that the evenings would be available for social activities in which the two could participate. We are satisfied that the arguments, together with the fact that, night after night, the defendant saw his wife walk out of the home, not to return until some hour the next day unknown to him, resulted occasionally in tense situations. Fracases or scuffles no doubt occurred, but we do not believe that in their course the defendant struck his wife. His uncontradicted testimony indicates that in the course of one of these affrays the plaintiff clawed his face badly with her fingernails. He swore that the wet towel mentioned by his wife in one of her above-quoted answers was upon his face at that time, mopping up blood, and not upon his wife's. We think he told the truth when he so stated. He also swore:

"I never took hold of her any more than to hold her from scratching my face."

The reasons for the quarrels we deem important. Normally, no wife can object to unpleasantries if she herself invited, induced or provoked them. We have already adverted, in part, to testimony which we believe

explains the unhappy situation which developed in this family's home. We shall continue with more of the evidence.

As a witness, the defendant gave the testimony which we have already quoted; that is, that no trouble developed in the family until after the plaintiff had begun a practice of coming home three to nine hours late after leaving her work. The defendant testified that after he had recovered from his illness and had resumed his employment there was no longer any need for his wife to continue in employment and that he so stated to her. He also swore that after he discovered his wife was falling into evil companionships at her place of employment, he urged her to stop work and take care of the household. He testified that he repeated those requests after he saw that the plaintiff was neglecting the children. In his efforts to persuade his wife to cease her employment and take care of the children, he appealed to her mother upon an occasion when she was visiting in his home. His efforts were unsuccessful. The plaintiff herself mentioned occasions when the defendant asked her to abandon her employment. One of these occasions was in November, 1943, when the plaintiff took ''a leave of absence'' from the restaurant, paid a visit to her mother's home and, upon returning, told the defendant that she was going back to the restaurant. She testified that when she announced that intention to the defendant ''he didn't like that and argued with me about it.'' We close this feature by quoting the following statement made by the defendant in answer to a question of the presiding judge:

''I have asked Mrs. Evans time and time if she wouldn't stay home and take care of the children. I feel I was perfectly able to earn enough money

to take care of the children for her and the children both; that she didn't have to work. There was no reason any more * * *. I have a nice home out there for them."

As a witness, the plaintiff declared:

"I told him I had a good job at the restaurant and I liked it and I wouldn't quit."

As a result, all of the defendant's efforts to persuade his wife to quit her employment and take care of the household were unsuccessful.

The defendant's criticism of his wife's conduct was not confined to her insistence upon continuing her employment. He referred at length to her neglect of the children and the fact that after her labors had been completed she failed to come home. He mentioned especially a waitress who was known as Patricia and who, he said, "was about eighteen years old." Concerning her, he testified:

"They were out practically every night after they got off work."

According to the defendant, the plaintiff "came home highly intoxicated night after night."

After the plaintiff entered the restaurant's employ as a night waitress she developed an acquaintanceship with many men in uniform who were customers of the establishment. After these men left Portland she carried on a clandestine correspondence with some of them. A letter which she wrote to a soldier in July of 1943 fell into the hands of the defendant and, upon his offer, it was received in evidence. Its phraseology is readily capable of an interpretation casting serious aspersions against the propriety of the plaintiff's relationship with that man. Two months before she wrote the

letter she had terminated all sexual relationship with her husband.

Upon one occasion the plaintiff came home at about seven in the morning in a taxicab bringing with her the aforementioned Patricia and a sailor who, we are satisfied, was so intoxicated that he could not walk. The plaintiff described all three as "drenched." She added that it rained that night. We believe that the sailor was drenched both inside and out. The plaintiff testified that she wanted to put this man in the defendant's bed. She claimed that he was Patricia's friend and that her purpose in wanting to put him in the defendant's bed was "as a favor to Patricia." The children were at home at that hour. The defendant's refusal to permit his bed to be used by the sailor provoked words, and finally the cab drove on with its "drenched" occupant. Upon another morning, some time between five and seven o'clock, the plaintiff again came home in a taxicab, bringing with her a party of five revelers who entered the home and made so much noise that the children were awakened.

After the plaintiff entered the restaurant's employ she generally reached home too late in the morning to prepare breakfast for the children. It will be recalled that on some occasions she visited the all-night theater after getting off work. On other occasions, she testified, she remained downtown waiting for the stores to open. On many occasions, according to the uncontradicted record, the plaintiff and Patricia went out together after their work had been completed. Owing to the absence of the plaintiff from the home at breakfast time, it was the defendant who prepared breakfast and got the children off to school. He attended to those matters before going to work in the shipyards.

In this same period the plaintiff rarely prepared dinner for the children and her husband. The defendant's uncontradicted testimony indicates the following:

> "At that time the children were getting what supper I got for them after I got home from work. When I got home there was absolutely no supper cooked at all for the children."

The plaintiff testified that Jacqueline was capable of performing the housework, but whether she actually prepared any of the meals is not indicated by the record. Upon one occasion when the defendant returned home he discovered that "Doris had a big burn on her eye, about half an inch from her left eye." It developed that the burn came from spattered grease while Doris, six years of age, was endeavoring to prepare some food. Upon cross-examination of the defendant, the following occurred:

> "Now this little Doris, your young child, she don't make a practice of doing any cooking, does she?
>
> "A. She has to find something to eat.
>
> "Q. Well, the children are all pretty well fed and cared for, aren't they?
>
> "A. If you would call eating one meal a day."

Except upon rare instances, it was the defendant who bought the provisions. Seemingly, it was he who bought the household furnishings. Upon the two occasions when illness of the children is mentioned in the record, it was the defendant who attended to their condition. He testified:

> "I have taken care of the children and seen that they had decent meals. I cut the lawn, and cleaned up the house in general."

The plaintiff's explanation for the situation which we reviewed in the preceding paragraphs was that be-

fore she took employment in the restaurant the defendant promised that he would help with the care of the children. That explanation might suffice were it not for the facts that (a) he later urged her repeatedly to terminate her employment, and (b) she absented herself needlessly from her home and children. Notwithstanding the fact that it appears from her own testimony that the fracases, upon which she depends to gain for herself a divorce, resulted from the defendant's insistence that she quit her work, the plaintiff testified that the defendant wanted her to continue in employment. We are satisfied that after the defendant saw the evils which followed in the wake of her employment he sincerely wished her to quit, and earnestly asked her to do so. In fact, the plaintiff testified:

"He would call up and tell me the children were starving and not cared for, when he agreed to take care of them when I was not there."

In May of 1943, concurrently with the conclusion of a visit by the plaintiff's mother to the Evans home, the plaintiff took the children and departed for a two-weeks' stay in the state of Washington. We are satisfied that the defendant had no knowledge of the plaintiff's intentions to make the trip nor any information as to where the family had gone. At the close of that two-weeks' visit, the plaintiff returned the children to the home but took up her own residence for the succeeding four or five days in a Portland hotel. It is clear that neither the defendant nor the children had any information as to her whereabouts. The defendant thus described the situation when he reached home in the evening after his day's work:

"Those children were in a high state of confusion at night when I got home. They were cry-

ing, begging and pleading, wondering where their mother was."

In seeking the truth concerning the issues before us, we are justified in paying heed to the motives of the parties. In that respect, we observe that by May of 1943, and possibly even prior to that month, the plaintiff had made up her mind to secure a divorce. She herself so testified freely. Her words were: "I had made up my mind to get a divorce." In making that statement she referred to her unannounced trip in May, 1943, to the state of Washington. After mentioning the trip, she added: "My mind was made up before I left." At least one of the incidents upon which the plaintiff depends to prove that the defendant was cruel to her occurred after May, 1943.

We also believe that the record shows that the plaintiff has falsified. We revert to the quotations from the complaint set forth in the third paragraph of this opinion; that is, to the quotation which begins: "Plaintiff further alleges * * *." We are satisfied that all of those averments are untrue and that their falsity is established by the plaintiff's own testimony. Particularly was the plaintiff heedless of the truth when she swore in her complaint that she was a widow at the time she married the defendant. It is conceded that she had not previously been married. Any litigant who, at the very inception of a suit, deals in such a manner with the truth cannot expect a court to resolve doubtful issues in her favor.

We believe that the defendant in his home life departed at times from the standards of a gentleman. We think, however, that his conduct and attitude toward the children was all that it should have been. The evidence is capable of supporting a finding that he

employed roughness at times toward the plaintiff. We are satisfied, however, that he had no desire to injure her and merely wished, through the use of strength, to prevent her departure from the home. The failure of his efforts illustrates once more that brawn, in the home especially, is never a substitute for the brain. We also believe that the defendant argued with the plaintiff in seeking to induce her to terminate her employment and take care of the household. Whatever may be the value of argument in the courtroom, it is worse than useless in the domestic establishment. We observe, however, that plaintiff's counsel asked his client the following question:

"Do you think it for the best interest of the children for you and your husband to be quarreling in front of them all of the time?"

She answered "No." Of course, the answer was correct, but there would have been no argument had she not been a participant. The defendant, as head of his family, made three mistakes: (1) He prompted his wife to accept employment; (2) he argued with her; and (3) he sought to control her conduct by use of his strength.

■ In *Douglas v. Douglas*, 163 Or. 689, 99 P. (2d) 479, this court employed a well-established rule which the opinion in that case expresses thus:

"To constitute a cause for divorce on the ground of cruelty, the cruelty must be unmerited and unprovoked unless it is unjustified by the provocation and out of proportion to the offense. Subject to that rule, where both parties contribute by misconduct to marital discord, neither is entitled to a divorce."

We think the rule just stated is universal; that is, that a divorce will not be granted for cruelty if the

latter was provoked by the victim and was not disproportionate to the provocation.

We believe that a wife's departure from the home night after night, over the sincere and earnest protests of her husband, and her failure to return until after he left in the morning for his place of employment, would ultimately provoke any normal man. Especially would he be provoked if he knew that his wife was carrying on a clandestine correspondence of an intimate nature with other men, and occasionally saw her bring to the home chance acquaintances of the kind which the plaintiff brought to hers. We revert to other facts bearing upon the matter of provocation.

When husband and wife become parents, the duties which each owes to the other become expanded. Each owes a duty to take proper care of the children so that they will ultimately become desirable members of society. We believe the evidence shows that the plaintiff, shortly after accepting employment in the restaurant, neglected that duty. Certainly, it was neglected when the plaintiff wilfully refrained from coming home in the morning. It is a credit to the defendant that when he saw this important duty neglected, he did what he could to become a substitute for the mother of the family. It is easier to condone his resort to argument, and his effort to buttress argument with constraint, than to condone the plaintiff's neglect of the children.

■■ The above is our reaction to the record. The transcript of testimony has been read and studied carefully. We have not overlooked the plaintiff's statement, uttered more than once, that she and the defendant cannot live together. As we have indicated, she arrived at that conclusion at least ten months before filing her suit. In the meantime, she lived with the defendant.

Her testimony that she and the defendant cannot live together is not a valid cause for divorce. Even where both husband and wife have testified that they cannot live together, this court has held that they do not thereby become entitled to a divorce. A recent instance is *Andrews v. Andrews,* 162 Or. 614, 94 P. (2d) 300, in which our present Chief Justice declared:

"The mere fact that the plaintiff and the defendant seem convinced they cannot live together in peace and happiness does not justify this court in dissolving the marital relation. The parties must be left where we find them."

In another recent instance, *Mauer v. Mauer,* 150 Or. 130, 42 P. (2d) 186, this court said:

"It may be, as the trial judge no doubt believed, that the interests of society would be best subserved by granting a divorce in this case, but it is submitted that divorces can be obtained only by the innocent party on some statutory ground. It should not be decreed on the ground of expediency, * * *."

In that case, the decree awarded to the wife in the circuit court was reversed.

Without further analysis of the case, we express our conclusion that the decree of the circuit court must be reversed. The cause will be remanded with instructions to dismiss the complaint.

BELT, C. J., and LUSK, J., concur.

———————

BRAND, J. (dissenting).

I dissent. The only witnesses concerning the reciprocal charges of misconduct were the plaintiff and the defendant. Decision depends upon our estimate of the character, conduct, and credibility of the parties. Much of the testimony is in direct conflict. The trial

judge saw the witnesses and granted a divorce to the plaintiff. I think his decree should be affirmed. This court has repeatedly recognized as a guiding, though not controlling, rule that a decree of divorce in favor of the plaintiff will not be disturbed on appeal by defendant where no questions of law are involved and the decree is based on conflicting evidence. *Dobbins v. Dobbins,* 31 Or. 584, 44 P. 692; *Stout v. Stout,* 99 Or. 133, 195 P. 153; *Rysdam v. Rysdam,* 160 Or. 153, 84 P. (2d) 112.

It will serve no good purpose to set forth at length the evidence which I consider favorable to the plaintiff. A few brief comments will suffice. The majority opinion suggests that a principal cause of trouble was the plaintiff's insistence upon working, over the protest of the defendant. Of this I am utterly unconvinced. Concerning her employment as night waitress at a restaurant, the defendant testified thus:

"Q. How did she come to go to work there, Mr. Evans?

"A. I asked her to."

When she suggested quitting her job, he said she was "chicken-hearted and couldn't take it." True, he asked her to quit as a waitress, but it was so that she might take a job in the shipyard, which she refused to do. The testimony concerning plaintiff's intoxication is directly denied.

The only witness other than the plaintiff and the defendant, a Mrs. Dunlap, had known the plaintiff for eleven years and testified without contradiction and impeachment that while plaintiff and defendant lived in Pendleton, she was a good wife and mother. I was not convinced concerning defendant's testimony

as to the plaintiff's alleged neglect of her children and believe that his testimony as to the plaintiff's occasional failure to return home promptly after a night of work was greatly exaggerated. A narrative of the life of plaintiff and defendant in Portland is characteristic of this feverish war era. The defendant worked days at the shipyard and the plaintiff worked nights at the restaurant. The resulting situation was not conducive to happy home life, but the plaintiff was not to blame for it. One fact is conclusively established, the plaintiff is a faithful and industrious worker. She helped support the family in Pendleton and in Portland. Defendant testified:

"Q. Wouldn't you say that during all of your married life your wife has been a hard working little woman?

"A. I will admit that.

"Q. No question about that?

"A. No question about it."

At the time of trial, the plaintiff was employed as a clerk-typist by the army engineers.

Upon the vital issue of physical violence, I think the evidence strongly preponderates against the defendant. The plaintiff testified that on several occasions the defendant beat her. Once he knocked her into the bathtub and gave her a black eye. Once he tore her bathrobe from her. She testified:

"A. I was all ready to go to work one night. He insisted I was not going. It started in then. He tore my dress and the next thing I remember I was on the floor and he made my nose bleed, and he grabbed my hand and pulled my head up and down and hurt my finger. He had a cold cloth on my face afterwards, but I went to work anyway."

The defendant's denial of this incident is strongly suggestive of the plea known as the negative pregnant. The age of chivalry may be past, but I still adhere to the view that a man must not beat his wife.

I think the plaintiff offers a fairly reasonable explanation of the sailor who was the "boy friend" of her "girl friend." He was certainly not brought to the house for immoral purposes because the plaintiff knew the defendant was at home and the condition of the sailor, whether from intoxication or otherwise, was such that he was taken to the hospital.

So much for the brief comment on the evidence. I come now to the serious considerations which have led me to express my dissent. I have no doubt that the defendant was guilty of cruel and inhuman treatment. I frankly concede that the plaintiff was also gravely at fault, though not to an equal degree. I concede, further, that persons whose fault was no greater than that of the plaintiff have, in the past, been held to be in *pari delicto* and, consequently, have been denied relief, although they have themselves been the victims of cruel and inhuman treatment. I concede that a divorce court may invoke the equitable doctrine of clean hands to deny relief to a plaintiff, even though recrimination is not pleaded as a defense, but I deny that it must do so.

"Strictly, recrimination is an affirmative defense which must be specially pleaded or set up in the answer as a defense in order that the defendant may have the right to give proof of such defense. * * *" 17 Am. Jur., Divorce and Separation, § 325, p. 314.

When it is claimed that a plaintiff who would otherwise be entitled to a divorce should be denied relief by reason of the rule that a party must come into equity

with clean hands, I think consideration should be given to the origin and purpose of the ancient maxim.

> "The maxim being one founded on public policy, public policy may require its relaxation. Even when the parties have been found to be in pari delicto, relief has at times been awarded on the ground that in the particular case public policy has been found to be best conserved by that course." 21 C. J., Equity, § 175, p. 189.
>
> "Divorce is a remedy for the innocent against the guilty; hence if both parties are equally at fault, a divorce will not be granted. This is known as the doctrine of recrimination, and rests upon the equitable maxim that he who comes into equity must come with clean hands; but the rule is not infrequently relaxed on grounds of public policy or the peculiar exigencies of the case, and comparative rectitude is considered." 19 C. J., Divorce, § 219, p. 93.

The above rule has twice been expressly approved by this court. *Condit v. Condit*, 115 Or. 481, 237 P. 360; *McElwee v. McElwee*, 171 Or. 462, 138 P. (2d) 208.

Turning to considerations of public policy, I question the wisdom of applying the normally wholesome maxim of clean hands as if it were a rule of property law. Divorce is not a lawsuit between two parties. It involves the wrongs of plaintiff and defendant, but it affects the rights of innocent children and the vital interests of society. In these matters, I think the courts are still controlled by mores, now discarded, of generations long since dead. We need an injection of realism into the law of domestic relations. When husband and wife come to the parting of the ways, they are no longer bound together by a strong, if not puritanical, public condemnation of divorce. They part. Then

some court, by a procedure which is often little more than a formality, confers its blessing upon the new freedom by granting a divorce. The court and the community appear to agree that the public welfare is served by freeing from the bonds of matrimony one who has been subjected to cruel and inhuman treatment. But if each spouse has subjected the other to such treatment and *if the facts are made to appear,* the court dooms both to the unhappy bonds and burdens of such a life—married in law, divorced in fact.

It is at this point that I think considerations of public policy are of more importance than legal rules of thumb. It is a truism to say that the sanctity of the home is the basis of Christian civilization, but I can not see why the law should be so concerned to maintain the marriage status, and theoretically the home, when both spouses are at fault, while granting wholesale dissolution of marriages when but one is at fault. The misconduct of both parties is often the result of an unfortunate incompatibility. In such a case, the legal recognition of a factual separation may restore both parties to useful and wholesome living.

Any judge who has had wide experience on the trial bench will concede that in divorce cases, theory and practice are as widely separated as the poles. I suppose that ninety-nine percent of divorces are granted on a routine *ex parte* hearing after the defendant has failed to appear, or has entered a general appearance and refused to plead further. In legal theory, the proceeding is an adversary action, but in a large proportion of cases, both parties are content that the divorce be granted. Frequently acquiesence reaches the verge of collusion. It has been my observation that when a divorce is contested it is seldom because the defendant

hopes, or expects, that the home can be kept intact if the decree is denied. The bitter contests almost invariably involve the adjustment of property rights or the custody of children.

If, in the multitude of default divorce cases the courts were to insist upon a bilateral disclosure of the real controversy and of mutual fault and then were sternly to apply the doctrine of *pari delicto* in those cases, as it does in the few instances of contest, the entire divorce system, as it now exists in fact, would become unrecognizable.

In cases of mutual fault, I think the court should be guided by two paramount considerations in determining whether to invoke the rule of *pari delicto*. It should consider, first, the welfare of the children, if any, and, second, what will be the probable effect on the parties and on society in general, if the divorce is denied. If, at the time of the trial, a separation has, in fact, taken place and there is no reasonable probability of a reconciliation, then we may be fairly sure that denying the divorce will not result in the reestablishment of the home. Again, if a definite separation has occurred and thereafter charges and countercharges are hurled at both litigants in the course of a contested divorce suit, so much bitterness is likely to be engendered that the possibility of reestablishing even the forms of normal domestic life in the same household will be utterly destroyed.

There may be instances in which persons with an enlightened sense of parental duty will reestablish a home if divorce be denied them in a contested suit and will carry on for the benefit of their children. If that result should appear to be within the realm of probability and the parties appear to be about equally at

fault, perhaps a court would be justified in denying a divorce in the hope that the home already broken might be mended, but I have never heard of such a case. If, in the case of mutual fault, the court finds that denial of the divorce will not result in the reestablishment of the home for the benefit of the children, then a serious problem of public policy arises. Assuming that father and mother will continue to live apart, is it for the good of society that the court should adjudge that they must forever remain married in law, when they are irrevocably unmarried in fact?

The fact that one or both parties to a marriage may have given the other one ground for divorce does not necessarily prove the offender to be of either a vicious or criminal disposition. If it did, the solution would be more simple. The causes of marital unhappiness and misconduct are often subtle and deepseated and are better known to the social worker or to the psychiatrist than to the judge. I am convinced that in many, though of course not in all, instances the interests of the children, of society at large, and of the parties themselves would be better served if the courts were to exercise more cautious circumspection in denying relief to a seriously wronged spouse on the ground of *pari delicto.*

By granting a divorce in such a case, the court would be recognizing the existence of facts over the continuation of which the law has no effective control, and it could then exercise to the fullest an informed discretion as to the custody of the children, awarding them to the parent most likely to serve them well, since it can not award them to both.

The opinion of the court in the case at bar is supported by precedent in this and other jurisdictions. I

have no criticism of it except to say that, in my opinion, the rules and practices in divorce litigation must be brought more nearly into harmony with the realities of life in the respects indicated. The trend of thought runs in this direction and will, I believe, ultimately prevail. The pending case is a close one, but I would grant a divorce to the plaintiff because I believe the defendant was guilty of cruelty; because I believe the plaintiff's fault is the lesser; and because I see no prospect of reconciliation between the parties in any event. I would then trust to the power and discretion of a court of equity, now and in the future, to determine and, if need be, to alter, the custody of the children with an eye single to their welfare.

Mr. Justice BAILEY joins in this dissent.