ELIZABETH BELL, Plaintiff and Appellant, *v.* DAVID BELL, Defendant and Respondent.

No. 9692.

Submitted March 26, 1958. Decided July 10, 1958.

328 Pac. (2d) 115.

Bernard E. Longo, Wm. R. McNamer, Billings, for respondent.
Bernard E. Longo, Billings argued orally for respondent.
Michael J. Whalen, Franklin S. Longan, Billings, Lee B. Farr, Miles City, for appellant.
Michael J. Whalen, Franklin S. Longan, Arnold A. Berger, Billings argued orally for appellant.

MR. JUSTICE HARRISON:

Elizabeth and David Bell were intermarried at Billings, Montana, in 1932. Three children were born of this union, two being of age and Robert, the youngest, being seventeen years old when this suit was filed.

On February 15, 1952, Elizabeth Bell instituted an action for divorce against David Bell.

*The Pleadings.* In her amended complaint plaintiff alleged that for more than one year preceding the filing thereof the defendant had inflicted grievous mental suffering and physical injuries upon the plaintiff, and had been guilty of a course of conduct toward plaintiff which was of such a nature as to destroy the peace of mind of plaintiff and defeat the legitimate objects of the marriage. The plaintiff then alleged the necessity for $500 attorneys' fees and $200 monthly alimony pending outcome of the suit.

On November 13, 1954, Judge Flachsenhar made and entered an order granting plaintiff $300 attorneys' fees and $150 a month alimony pending the final adjudication. Prior to that time he had made another order granting plaintiff $300 attorneys' fees; thus the total attorneys' fees granted was $600. On November 22, 1954, the defendant filed his answer in which he admitted the marriage, that it was necessary for plaintiff to engage counsel to prosecute the action; but, alleged that he had already paid her $600 in attorneys' fees, and denied each and every other allegation in the amended complaint.

By way of cross-complaint, defendant alleged that plaintiff had been guilty of inflicting grievous mental cruelty upon him for more than one year preceding the filing of the complaint; that she had inflicted or threatened to inflict grievous bodily injury dangerous to life upon his person; that she had repeatedly inflicted or threatened bodily injury and personal violence upon him, which course of conduct justly and reasonably was of such nature and character as to destroy the peace of mind and happiness of the defendant, to entirely defeat the proper and leg-

itimate objects of marriage, and to render the continuance of the marriage relation between the parties perpetually unreasonable and intolerable to the defendant; that defendant is the fit and proper person to have the care, custody and control of the minor child, Robert.

On the same day the answer and cross-complaint were filed, defendant moved the court upon affidavit for the issuance of an injunction *pendente lite* to restrain plaintiff or her agents from depriving him of the use of the furniture, fixtures, appliances and furnishings of the home formerly occupied by the plaintiff and defendant, with the exception of the sewing machine.

The grounds for issuing the injunction were alleged as follows: That the plaintiff had surreptitiously entered the home of the parties, removed all of the furniture, and poured lubricating oil over the wall-to-wall carpeting, valued at $1,600; that taking the furniture from the dwelling house would breach the sales contracts under which the furniture was purchased and put defendant in immediate default; that if the furniture was not immediately returned he would be defaulted in his payments and suffer great and irreparable injury; that defendant was not financially able to replace the furniture and furnishings so taken; that defendant was afraid that plaintiff, if not restrained from so doing, would sell the furniture and furnishings to the great and irreparable injury of the defendant.

An injunction order *pendente lite* was issued on November 22, in accordance with the prayer of the defendant, requiring defendant to file a $1,000 bond and ordering him to serve a plaintiff with a copy of the affidavit and order.

The Honorable W. W. Lessley was called in to preside in this action on January 22, 1955, and on January 24 he accepted jurisdiction.

On April 16, plaintiff made application for augmentation of attorneys' fees in the sum of $750.

It should be noted that until November 19, 1954, plaintiff was represented by Joseph P. Hennessey, Esq., but on that day

he withdrew from the action. Plaintiff then sought the legal services of Farr and Farr of Miles City, and Michael J. Whalen, of Billings, who represented her thereafter.

On June 15, 1955, defendant filed an amended and supplemental answer and amended and supplemental cross-complaint conforming in most particulars to the first answer and cross-complaint hereinbefore set forth, except it added the further allegation that plaintiff had committed adultery.

Reply was filed on July 5, putting in issue the affirmative defenses and cross-complaint contained in the answer, and on August 3, the cause came on for trial.

*The Evidence.* Plaintiff's testimony in her own behalf upon her case in chief was to the effect that the defendant had upon several occasions struck her, vilified her with vile, vulgar and profane names, and had unjustly accused her of marital infidelity; that she loved her children and neither drank nor frequented bars; that as a result of the physical verbal and mental abuse from defendant she became nervous and upset and sought the services of Dr. Ruona, a psychiatrist, who was visited by plaintiff and defendant and advised hospitalization for the plaintiff; that she was hospitalized for about two months; that after she returned home from the hospital, the defendant again resumed his verbal abuse of her, and again made threats of physical violence against her person; that because of her nervous condition she was not supposed to work; and that she needed as living expenses at least $200 a month.

On cross-examination of the plaintiff, the following testimony was elicited: That she had visited Canada in the company of a man, not her husband, allegedly for the purpose of helping him with his horses; that she stated she did not drink; that she visited bars but did not drink at them; that she only went to the Empire Bar to eat. However, alimony checks were introduced in evidence showing that she had cashed them in the Mint Bar, the Empire Bar and the Shamrock Bar.

On cross-examination with reference to her relationship with one Cal Rentz, plaintiff testified in part as follows: That she

had met Rentz the previous fall; that when she wanted to go some place she would have him drive her there; that she could not remember whether she had frequented bars or gone out with him alone in the evenings.

Leah Bell, defendant's sister-in-law, testified she saw defendant strike the plaintiff during an altercation at the Shiloh School, and another time at the Eagles Club in Billings; that she had seen the defendant in the company of other women, and had heard defendant abuse the plaintiff with vile and vulgar names and accusations. Both of the instances testified to by Leah Bell wherein defendant purportedly struck the plaintiff, were contradicted by testimony of defendant's witnesses.

Dr. M. A. Ruona testified that plaintiff had come to him for treatment and had been under his care since January 29, 1954; that she was hospitalized from February 8 to April 3, 1954, for a functional nervous disorder, and was given intensive psychiatric and mechanical therapy, shock and insulin treatment, electroshock treatment and medication. At the termination of her hospitalization, the defendant was advised by Dr. Ruona that his wife had to be handled carefully and not be emotionally disturbed. Her condition worsened after the termination of her hospitalization.

Although having previously denied it, upon rebuttal, plaintiff admitted she had hit the defendant with a shoe on one occasion and with a broom on another; that Cal Rentz had been persistent in his attempts to be "fresh" with her; that she had frequented bars in his company, but finally terminated their relationship because he drank to much. The reason given for her frequent trysts with Rentz was that she was without transportation; that he was an "employee" of hers and drove her wherever she wished to go in return for her purchasing the gas and oil for his automobile.

Plaintiff's son, Donald, testified that when Rentz visited the house the plaintiff stated he was a "salesman". Another of her children stated she referred to him as a "lawyer".

Various witnesses on behalf of the defendant testified to hav-

ing seen plaintiff and Rentz at bars, stores, restaurants, in his car, and at night clubs.

Defendant hired a private detective, who after failing to keep up with the Rentz automobile, finally stayed in a room at the Alexandra Hotel in Billings next to the room where the plaintiff and Rentz spent the entire evening together. This testimony was corroborated by Mr. McClurg, the detective's assistant.

Mildred Lenhardt, switchboard operator at the Custer Hotel, testified to the plaintiff having a male visitor during her stay at the Hotel.

Janet Reiter, daughter of the parties, testified that there were constant arguments over mere incidental things of everyday life; that in addition to her mother arguing with the defendant, plaintiff constantly argued with her and all the other members of the family; that on one occasion when the plaintiff came home smelling of intoxicating drink, plaintiff got angry with her husband for having spilled coffee on the floor, and started to upbraid him; that during the altercation plaintiff threw a shoe at the defendant. She also testified to plaintiff's drinking at the Eagles Hall, and that her mother was intoxicated and had drank in their home at night.

Robert Bell testified in part, as follows: That on one occasion his mother poured hot coffee over him; that he waited for plaintiff in the bar at Eagles Hall from 3:00 o'clock until 7:00 o'clock in the afternoon, while plaintiff and a friend, Mrs. Peterson, were drinking, despite the fact that he had asked her three or four times to take him home.

Dorothy Bell, the wife of Donald Bell, testified to the constant arguments and also to the fact that they were not provoked by the defendant but were started by the plaintiff; that plaintiff borrowed her car and when plaintiff returned home she was very intoxicated, had been brought home in another car and could not remember where she had left the Bell automobile.

Bill Padgett, one of the hired hands, testified to the fact that one morning, upon entering the Bell house, he found all of the

furnishings were removed therefrom and that the wall-to-wall carpeting was saturated with oil.

Defendant, upon taking the stand, testified that in order to appease his wife he had built her a new house and had borrowed the sum of $25,000 on the property to finance the project. In addition, he had provided the plaintiff with every modern convenience that could be purchased, including dishwasher, deep freeze, electric range, automatic washer and dryer, and as Janet Reiter, their daughter testified, "everything."

Defendant stated that one night he came home about 11:30 after having taken his youngest boy to the Shrine Auditorium to see a barn dance program. When he got home he testified plaintiff sat up in bed, started to call him names, and accused him of everything imaginable; that he did not want to argue, so he went to bed turned his back, and that she took a lamp and hit him on the head with it, that the lamp broke, causing a big bump on his head; that he put her out the door and held it shut; and that she threatened to kill him.

Defendant also testified that plaintiff had hit him over the head a half dozen times or so with a mop handle which had a screw on the bottom and had sharp edges which cut. As a result of being hit over the head he had severe lacerations which necessitated medication from a doctor.

On another occasion he testified that after taking the help to town he came home about 10:00; that plaintiff started an argument and did not want to let him in; that after she let him in, she went to the kitchen, came back and threw a handful of pepper in his eyes.

At the conclusion of the trial, the court made findings of fact and conclusions of law.

By finding of fact number (3), the court found defendant entitled to a divorce under section 21-106, subd. (4), R.C.M. 1947; by finding of fact number (4), the court found defendant entitled to a divorce under section 21-106, subd. (1); by finding of fact number 5, the court found defendant was entitled to a divorce under section 21-106, subd. (2); and further found that

defendant was not guilty of the infliction of extreme cruelty upon the plaintiff or the infliction of grievous mental suffering upon the plaintiff and that defendant had not proven the allegation as to adultry charged against the plaintiff.

As conclusions of law the court found that David Bell was entitled to a decree of absolute divorce from the plaintiff; that Elizabeth Bell was not entitled to a decree of divorce from the defendant; that defendant should have the care and custody of Robert David Bell; that the sum of $600 was a reasonable attorneys' fee and that the plaintiff was not entitled to further payment for attorneys' fees in this matter. Judgment was entered in accordance with the findings of fact and conclusions of law.

Plaintiff now appeals upon ten specifications of error which resolve themselves into the following issues:

(1) Was there sufficient evidence to support the findings of fact and conclusions of law in favor of defendant's answer and cross complaint? (2) Was there insufficient evidence to support a finding of recrimination? (3) Did the court abuse its discretion in denying the plaintiff attorneys' fees? (4) Did the trial court err in not granting the plaintiff a new trial?

If the decree of divorce may be affirmed on any one of the three grounds set forth in the court's findings of fact, then this court must find the evidence sufficient to support the findings of fact and conclusions of law.

It is apparent from a cursory examination of the evidence set out above that the court had ample evidence upon which to base its decree of divorce on the grounds, "That the plaintiff has repeatedly inflicted and threatened bodily injury and personal violence upon the defendant."

If the evidence is in conflict, this court has committed itself to the following proposition: "Where, as here, the evidence in a case tried before the court without a jury is in conflict the court's decision is conclusive on appeal; the trial court being in a more advantageous position, in consequence of seeing and hearing the witnesses and observing their demeanor and manner of testifying, to determine their credibility than this court upon a re-

view of the cold record. [Citing cases.] *And in an action for divorce, as in other equity cases, the findings of the trial court will not be disturbed on appeal, unless the evidence decidedly preponderates against them.*" Emphasis supplied. Williams v. Williams, 85 Mont. 446, 449, 278 Pac. 1009, 1101.

Plaintiff however based a defense for her acts of cruelty on the alleged grounds that she was provoked into action by defendant's insults, vulgar and vile language, unfair accusations, and physical abuse. The record as a whole warranted the court in finding against plaintiff's contention that the defendant used physical force against her during the marriage, but that on the contrary the plaintiff was guilty of the physical attacks.

As to the false charges of adultery, we commend the following remarks found in 17 Am. Jur., Divorce and Separation, section 201, p. 392, 393:

"In accord with the general doctrine of provocation it is held that although false charges of adultery may constitute cruelty, such charges are not actionable where the accuser had reasonable grounds to believe them to be true, as where plaintiff's conduct was suspicious." Citing Steele v. Steele, 237 Mich. 639, 213 N.W. 66, 51 A.L.R. 1186; Ruff v. Ruff, 78 N.D. 775, 52 N.W. (2d) 107. Annotation 143 A.L.R. 635, 639; Staedler v. Staedler, 6 N.J. 380, 78 A. (2d) 896, 28 A.L.R. (2d) 1291.

Whether the use of vile and profane language would constitute provocation in this case we commend the following quotation from Evans v. Evans, 176 Or. 403, 157 Pac. (2d) 495-497:

"We are satisfied that the plaintiff herself used profane language and that she did so at times in the presence of the children. Only those who have taken themselves sufficiently in charge so that they have bridled their own tongues are in a position to criticize unbridled tongues."

Moreover whether sufficient provocation existed to provoke plaintiff into violent action was for the trial judge to determine, "having the opportunity to see and hear the witnesses, [he] is best able to ascertain whether the physical violence used was induced by the other spouse, or whether, under the circumstances,

it was out of proportion to the provocation." Popescu v. Popescu, 46 Cal. App. (2d) 44, 115 Pac. (2d) 208, 212.

In the absence of any material showing of provocation on the part of defendant, and finding there was a clear preponderance of the evidence to support the finding of the trial court, we hold that the first question presented must be answered in the affirmative.

*Recrimination.* Plaintiff maintained that the trial court erred ▮ is not disallowing a divorce to both parties on the grounds of recrimination. R.C.M. 1947, section 21-118.

The trial court specifically found in effect to the contrary in the sixth finding of fact: "That the defendant is not guilty of the infliction of extreme cruelty upon the plaintiff, nor is he guilty of the infliction of grievous mental suffering upon the plaintiff."

Furthermore the defense of recrimination as an absolute defense has been seriously modified in a recent opinion authored by Mr. Chief Justice Adair. See Bissell v. Bissell, 129 Mont. 187, 197, 284 Pac. (2d) 264; see also 17 Am. Jur., Divorce and Separation, section 264, p. 443. There was no room for the application of recrimination to the facts in this case.

*Attorneys' Fees.* The court disallowed plaintiff's request for more attorneys' fees at the conclusion of the trial. Plaintiff, while acknowledging that the granting of attorneys' fees is a matter within the discretion of the court, maintained the court abused its discretion in this case.

It will be remembered that prior to the time plaintiff engaged Farr and Farr and Michael J. Whalen in this action, the court had already allowed plaintiff $600 for attorneys' fees, none of which has been paid over to her present attorneys. Plaintiff stated at the trial she has not paid present counsel anything.

At the trial of the action defendant's accountant was called as a witness and testified to the following facts: That in 1952 defendant had a net loss on the farm of $7,649.04; that in 1953 he had a net income of $3,277.20; and that in 1954 his federal income tax return reflected a net loss of $2,222.10.

The defendant was also indebted on a farm mortgage with a principal balance at the time of trial of $24,307.54. This indebtedness as the record shows was incurred when the defendant built a $25,000 home at the insistence of the plaintiff. The defendant had, in addition to the mortgage, other obligations totaling $12,147.29. His financial situation had become so severe that he was required to turn his entire income over to the bank in payment of his yearly bank loans. In return he was allowed $200 per month for living expenses. Up to the trial he was paying his wife $150 per month alimony which left him a cash income of $50 per month.

The Montana law pertaining to the allowance of attorneys' fees pending trial is contained in R.C.M. 1947, section 21-137, which in part reads as follows:

"While an action for divorce is pending the court or judge may, *in its or his discretion,* require the husband to pay as alimony any money necessary to enable the wife to support herself or her children, or to prosecute or defend the action." Emphasis supplied.

The cases interpreting and applying the statute have consistently held that attorneys' fees are wholly within the discretion of the court to grant upon a showing of necessity. Bordeaux v. Bordeaux, 29 Mont. 478, 75 Pac. 359, upon rehearing 32 Mont. 159, 162-163, 80 Pac. 6; Docotovich v. Docotovich, 125 Mont. 56, 229 Pac. (2d) 971; 17 Am. Jur., Divorce and Separation, section 635, p. 709. However a showing of necessity is a condition precedent to the exercise of the court's discretion. Bordeaux v. Bordeaux, supra, 29 Mont. 478, 75 Pac. 359; 32 Mont. 159, 162-163, 80 Pac. 6; Albrecht v. Albrecht, 83 Mont. 37, 47, 269 Pac. 158; Docotovich v. Docotovich, supra, 125 Mont. at page 62, 229 Pac. (2d) at page 974.

One of the facts actuating a court to disallow attorneys' fees (exercising its discretion) is the manner in which the wife has pressed or defended the action without the allowance. "Thus, where it does not appear that the wife has been hampered in making the defense or is financially unable to pay expenses

584

necessarily incurred, the decision of the lower court denying an allowance will be affirmed.'' 17 Am. Jur., Divorce and Separation, section 635, p. 709. See also Bordeaux v. Bordeaux, supra, 32 Mont. 159, 162-163, 80 Pac. 6; Albrecht v. Albrecht, supra, 83: Mont. 37, 46-48, 269 Pac. 158.

While it has been held that the court may reserve its ruling on additional attorneys' fees until after trial, its action remains discretionary. Huntington v. Huntington, 120 Cal. App. (2d) 705, 262 Pac. (2d) 104, 108; Nelson v. Nelson, 100 Cal. App. (2d) 348, 223 Pac. (2d) 636, 638, 639. Moreover, the court in excercising its discretion at that time may take into consideration the fact it found the wife guilty of misconduct. Annotation 2 A.L.R. (2d) 307, 329; Brown v. Brown, 3 Terry 157, 42 Del. 157, 29 A. (2d) 149; Moss v. Moss, 196 Ga. 340, 26 S.E. (2d) 628; Coffee v. Coffee, 145 Miss. 872, 111 So. 377; Ex parte Austin, 245 Ala. 22, 15 So. (2d) 710; Adams v. Adams, 49 Mo. App. 592; 17 Am. Jur., Divorce and Separation, section 649, p. 721.

Here we have a case where defendant was compelled to supply plaintiff with $600 for attorneys' fee pending the trial where there was no showing at the trial the plaintiff lacked counsel or witnesses in prosecuting her action; where the plaintiff has been found guilty of gross misconduct; and where the defendant has, because of financial difficulties, been put on a $200 a month allowance. We cannot see where the court abused its discretion in refusing to augment the attorneys' fees already granted.

*New Trial.* The plaintiff, at the conclusion of the trial, filed her motion for a new trial on the grounds that an irregularity on the part of the defendant prevented the plaintiff from having a fair trial, and that plaintiff has discovered new evidence material to the cause of action which with reasonable diligence she could not have discovered and produced at the trial. This motion is based upon the affidavits of Martha Skauge, Lydia Fox, Connie Peterson, Elizabeth Bell, M. A. Ruona, Michael J. Whalen.

The misconduct which is complained of is found alleged in the affidavits of Martha Skauge, Lydia Fox and Connie Peterson. Martha Skauge, a sister of the plaintiff, states that because the defendant threatened her on one occasion, she, out of fear for herself and her children that defendant would "get" her if she got involved in any of his affairs, removed herself and her children to Two Dot, Montana, during the trial of the action and made herself unavailable to testify.

Lydia Fox, also a sister of plaintiff, states that, because of the threats to Martha and because the defendant purportedly drove back and forth in front of Lydia's house while the plaintiff lived with her, she also removed herself and her children to Two Dot, Montana, making herself unavailable to testify.

Connie Peterson stated that defendant told her to keep her nose out of his business.

Defendant denied that he threatened Martha Skauge or Lydia Fox or that he ever drove "up and down" in front of their homes; that he, Mrs. Fox and Mrs. Skauge were on amiable terms, but that he had on two or three occasions told Martha Skauge to "leave his wife alone and that she was causing trouble by taking her around to night clubs and drinking without the company of their husbands, as the said Martha Skauge had been doing, and that your affiant, did on the time at the Western Bar adverted to in Martha Skauge's affidavit and at which time both Martha Skauge and Lydia Fox were intoxicated, inform the said Martha Skauge that she was the cause of much of his domestic troubles" but "denies any threat being made to her."

Plaintiff contends the above alleged acts of defendant are sufficient to grant a new trial on the ground of irregularity preventing the plaintiff from having a fair trial (citing Buntin v. Chicago, etc., Ry. Co., 54 Mont. 495, 172 Pac. 330, and Phares v. Krhut, 76 Kan. 238, 91 Pac. 52).

Both cases are clearly distinguishable. In the Buntin case the witness prevented from testifying was forcibly withheld from so doing by defendant secreting him in a downtown office building.

In the Phares case, the suit was against the county clerk. A new trial was granted when it was discovered the defendant had loaded the jury panel box, from which juror's names are drawn, with his friends' names to insure a verdict in his favor.

The case most nearly identical to the instant one is Ratcliff v. Sharrock, 44 Okl. 592, 145 Pac. 802, 804. The following language of that case is controlling here:

"The next proposition urged is that the court erred in refusing to grant plaintiff's motion for a new trial; there being filed in support of said motion, as one of the grounds therefor, an affidavit of one George Sirmons, to the effect that he was intimidated and threatened by the defendant in such a manner as to cause him to become ill and unable to attend the trial, where he would have been a witness for the defendant, and further setting out the nature of the testimony he would have given. The defendant filed a counter affidavit, denying that he had in any way intimidated Sirmons, so that he was unable to attend the trial as a witness, etc. If the allegations of Sirmons were true, defendant would have been guilty of a misdemeanor of obstructing justice. [Citing authorities.] A new trial may be granted for misconduct of the prevailing party. (section 5033, Rev. Laws 1910; Phares v. Krhut, 76 Kan. 238, 91 Pac. 52), but we cannot determine from the record that defendant did intentionally intimidate Sirmons or prevent his attendance as a witness at the trial. *There is nothing in the record to show that Sirmons was subpoenaed—nothing to show that he would have been a witness, or that defendant threatened him, except his own affidavit, which is flatly contradicted by the affidavit of defendant. In such cases the trial court is vested with a wide discretion in the granting or refusal of motions for new trials, and its action can only be reviewed where it is shown that the court abused its discretion. From the record we are unable to determine the veracity of the affidavit of Sirmons, and cannot say with any certainty that the discretion vested in the court has been abused.*" Emphasis supplied.

See also Bancroft, Code Practice and Remedies, section 6000,

p. 7922; Stekoll v. Lebow, 96 Okl. 76, 219 Pac. 899, 901; Bride v. Bride, 131 Okl. 176, 268 Pac. 212, 215.

The second ground, discovery of new evidence, is equally in- ▇ sufficient upon which to grant a new trial. Both Lydia Fox and Martha Skauge were not subpoenaed, nor were they properly interrogated about their knowledge of any instances of misconduct on the part of the defendant before the trial of this case. Plaintiff states in her affidavit that she called Martha Skauge and Lydia Fox the evening before the trial of the case. The attorney for the plaintiff made no diligent attempt to interrogate plaintiff's sisters nor were any subpoenas issued.

Plaintiff states that because of her nervous condition during the stress and strain incident to the occasions verified to in the affidavits of Martha Skauge and Lydia Fox, she could not remember at the time of this action all that occurred. Nevertheless, she testified at the trial she lived at their house and frequently visited them. Surely, it was incumbent upon her or her attorneys to determine what those parties knew and to what they could testify.

As to the affidavit of M. A. Ruona, anything he could add could have been fully adduced at the first trial. No attempt having been made by plaintiff's attorneys to fully elicit all of his testimony then, we cannot see why plaintiff should be allowed to have him testify again to matters fully within his knowledge at the first trial. Ruona did state in his affidavit that he did not testify or reveal the facts contained therein at the trial, because of his doctor—patient relationship with defendant and plaintiff. Yet at the trial plaintiff waived her privilege and defendant on the stand denied any such relationship.

The facts contained in Connie Peterson's affidavit appear to ▇ be merely cumulative and furthermore do not appear to be of sufficient weight to change the result in this case.

Michael Whalen's affidavit is merely to the effect he did not know of, nor was he advised by plaintiff or the other affiants as to the facts they could testify to. No showing of due diligence was made as required by our statute and laws.

The rules governing the granting of a new trial on the grounds of newly discovered evidence are set out fully in State v. Matkins, 45 Mont. 58, 121 Pac. 881, and Ebaugh v. Burns, 65 Mont. 15, 20, 210 Pac. 892, 894.

As was stated in those cases, it must appear from affidavits that it was not through want of diligence that the evidence was not discovered earlier.

In In re Colbert's Estate, 31 Mont. 461, 483, 78 Pac. 971, 80 Pac. 248, 249, 107 Am. St. Rep. 439, 3 Ann. Cas. 952, this court with regard to the diligence required to be shown in the affidavits, said:

"The movant for a new trial on the ground of newly discovered evidence must set forth such facts as will enable the court to determine whether reasonable diligence was exercised. Every presumption that he could have secured the testimony for the former trial will be indulged against him. He must therefore negative any negligence. The question being one for the court, as to whether reasonable diligence was excercised and this question having to be determined upon the affidavits filed, great care should be exercised in their preparation. They should set forth such facts as will enable the court to determine whether reasonable diligence was exercised. They should state in detail and with particularity what was done by the parties with reference to obtaining the new evidence, how and when it was discovered, etc., and thus give the adverse party the opportunity to traverse the statements if desirable. The reason of this rule is well stated in Baker v. Joseph, 16 Cal. 173: *'The temptations are so strong after a defeat in an angry and bitter controversy involving considerable interests, and the circumstances that testimony has just been discovered, when it is too late to introduce it, so suspicious, that courts require the very strictest showing to be made of diligence and all other facts necessary to give effect to the claim.'* " Emphasis supplied.

See also Nicholson v. Metcalf, 31 Mont. 276, 78 Pac. 243; Hines v. Driver, 100 Ind. 315 (cited with approval in In re Colbert's Estate, supra, as being exhaustive of the question); Butler v.

Paradise Valley Irr. District, 117 Mont. 563, 160 Pac. (2d) 481.

For the foregoing reasons the judgment of the district court is affirmed.

MR. JUSTICES CASTLES, ANGSTMAN and ADAIR, and THE HONORABLE C. B. ELWELL, District Judge (sitting in place of MR. JUSTICE BOTTOMLY), concur.