**Dorothy GRESS, Plaintiff-Appellant-Respondent,**

**v.**

**Ray GRESS, Jr., Defendant-Respondent-Appellant.**

**No. 8360.**

Supreme Court of North Dakota.

Jan. 19, 1967.

Greenwood & Swanson, Dickinson, for plaintiff.

Reichert & Howe, Dickinson, for defendant.

ERICKSTAD, Judge.

The plaintiff, Dorothy Gress, appeals from the judgment of the District Court of Stark County which granted the defendant, Ray Gress, Jr., a divorce on his counterclaim. She demands trial de novo.

The judgment granted Mr. Gress a divorce on the ground of cruelty. Mr. Gress appeals from that part of the judgment which denied him a divorce upon the ground of adultery and demands trial de novo. At the time of the oral argument in this court he stated that he was not asking for any change in the judgment and that he cross-

appealed merely so that the issue of adultery could be properly considered on this appeal.

In her complaint dated March 8, 1965, Mrs. Gress asserted that she and the defendant were married at Dickinson, North Dakota, on August 13, 1951; that during the course of their marriage they adopted Heidi and Mark, 7 and 8 years of age respectively as of the date of the complaint; and that during the past several years of the marriage Mr. Gress had been guilty of extreme cruelty.

That part of the complaint which alleged extreme cruelty resulting in mental and physical suffering reads as follows:

> That for the past several years and during the marriage of the plaintiff and defendant as aforesaid the defendant has been guilty of extreme cruelty and of cruel and inhuman conduct toward the Plaintiff, and that many times during this period has inflicted bodily injury upon the plaintiff; that the most recent occurrence was on the 3rd day of March, 1965, when the defendant physically assaulted and caused her grave physical harm; that on numerous occasions the defendant has used abusive and unkind and cruel language towards the plaintiff and has called her vile and obscene names which was calculated to and did cause the plaintiff grievous mental suffering and physical suffering.

In her prayer for relief Mrs. Gress asked that she be granted a divorce from Mr. Gress; that she be given custody of the minor children; and that Mr. Gress be required to pay a reasonable amount of money for the support and maintenance of the minor children and of her.

In his answer Mr. Gress denied that he had been guilty of extreme cruelty and alleged that he had been obliged on occasion to defend himself from physical assaults made by Mrs. Gress. He also asserted that she was not a fit and proper person to have custody of their minor children.

In his cross-complaint Mr. Gress asserted grounds for divorce as follows:

## IV.

That Defendant and Cross-Complainant is informed and believes, and upon such information and belief alleges that at various times between approximately February 1, 1965, and April 26, 1965, in the city or in the vicinity of the City of Dickinson, North Dakota, the Plaintiff committed adultery with one W—— L——.

## V.

That for the past several years, commencing on or about the 1st of September of each year to approximately June 1st of each year, the Plaintiff has regularly absented herself from the family home approximately three (3) nights a week between the hours of approximately 6:30 o'clock p. m., and 12:00, 1:00, 2:00 or 3:00 o'clock a. m., on the pretense of bowling. That although bowling during the early hours of each evening, subsequent to such bowling activities, the Plaintiff did, until late hours mentioned, hang about certain bars and lounges, eating, drinking and dancing, and in the company of other men. That on the night of December 27 or 28, 1963, this Cross-Complainant did discover the Plaintiff in an automobile in the alley behind the Esquire Club at approximately 2:00 o'clock a. m., in the embrace of another man. Plaintiff frequently during the past several years has been out of Dickinson to Bismarck, Minot, Miles City, Denver, Billings, Minneapolis, and other cities for the ostensible purpose of participating in bowling tournaments, and Cross-Complainant has been informed and advised that her conduct on such occasions and the hours she kept were such as to raise question as to her fidelity and observance of her marriage vows.

## VI.

That Plaintiff has for more than one year last past indulged excessively in intoxicants and has also indulged excessively in the use of so-called "pep pills" and tranquilizers; she has regularly neglected her wifely and household duties; has failed and refused to participate in any social or other family activities with Cross-Complainant and the other members of the family, and has treated Defendant in a cruel and inhuman manner, the aforesaid acts of cruelty causing great pain and mental anguish to this Cross-Complainant, which has impaired his health, made him extremely nervous, destroyed his happiness, has completely destroyed the legitimate objects of matrimony and has convinced this Cross-Complainant that said Plaintiff no longer cares for him.

In the prayer for relief of the answer and cross-complaint Mr. Gress asked that the plaintiff's action be dismissed; that he be granted a divorce from the plaintiff; and that he be given custody of the minor children and such other relief as the court deemed just and equitable.

Mrs. Gress in reply denied all the material allegations of the answer and cross-complaint.

Following the trial the court concluded that Mrs. Gress was not entitled to a divorce, but that Mr. Gress was entitled to one because of the extreme cruelty inflicted upon him by her. It also concluded that the parties had an equity of $20,000 in certain real and personal property and that Mrs. Gress was entitled to $10,000 thereof, to be paid her in monthly installments of $100 per month plus interest at the rate of 4% per annum. As security for the payment of this money the court provided that Mrs. Gress should have a lien upon all the real property. In addition, it concluded that Mrs. Gress was entitled to all of her personal effects, clothing, and any items of household goods which she brought into the marriage or made during the marriage. It specifically ordered that she should have the sewing machine and the 1962 Mercury Comet automobile.

The trial court ordered that Mr. Gress was to be the owner of all the rest of the real and personal property. It also ordered that Mr. Gress assume and be responsible for paying all debts and obligations owing by the parties, and that he pay Mrs. Gress $500 as attorney's fees.

It is from the judgment entered pursuant to the conclusions of the trial court and its order that the appeals are taken.

Mrs. Gress has filed fourteen specifications of error, but instead of discussing those specifications of error separately, she has chosen on appeal to divide her argument into three parts, namely: (1) the sufficiency of the evidence to support the trial court's findings and conclusions; (2) the effect of the testimony of the unlicensed private detective; and (3) the custody of the children.

As to the issue of the sufficiency of the evidence, it is Mrs. Gress's contention that the trial court erred in finding that she did not sustain the burden of proving cruelty on the part of Mr. Gress.

Mrs. Gress bases her allegation of cruelty upon various alleged physical assaults committed by Mr. Gress upon her. Let us review the evidence in that respect.

Mrs. Gress testified that on March 3, 1965, Mr. Gress became angry after going through a drawer which contained all of her bills and stated that she was ruining his credit by not paying the bills. She testified in part as follows:

A. Well, Ray was very angry. He grabbed my arms, shouted at me and said many nasty things. He twice had my arms behind my back. He tore my clothing. He grabbed me around the neck and strangled me until I fell to the floor.

Q. You say you fell to the floor?

A. Yes, or I was unconscious.

Q. You lost consciousness?

A. Yes.

Q. And where were his hands as this time?

A. They were on my throat.

Q. Was he exerting any pressure?

A. Yes, he was.

Q. Did you have difficulty breathing?

A. I couldn't breathe at all.

Q. How long were you unconscious, do you have any idea?

A. Just momentarily.

Q. And what happened when you fell to the floor unconscious?

A. When I woke up he was kicking me with a sharp toe of his western boot.

Q. What kind of a boot?

A. Western boot.

Q. And where was he kicking you?

A. I was kicked in the ribs and on my breast.

Q. Were there any marks left as a result of this beating?

A. Yes, there were.

Q. And where were they located?

A. On my rib, on my left rib and on my left breast.

Q. Were there any marks on your throat or face?

A. Red marks on my throat, black and blue marks on my face and arms.

Q. What part of the face?

A. My right cheek had a mark down the side of it.

Q. And do you know how you got that mark?

A. He struck me.

Q. What did he strike you with?

A. Struck me with his fist.

Q. And this occurred on March 3 of this year?

A. Yes.

She testified that about a year prior thereto, in March or February, Mr. Gress physically assaulted her in their home. Her testimony in that regard reads as follows:

Q. What happened on that occasion, tell us what he did to you on that occasion?

A. Well, it wasn't so severe. He struck me and twice had my arms and choked me with his hands. He always choked me for some reason. His hands were always on my throat. But I can recall he was planning a trip to Fargo, he wanted me to go with him and I would liked to have gone but my mother was there. She was leaving about this same time and we argued about it. I did go get my mother a reservation a day early so she could leave the same day we planned on going. We got a babysitter for one child and took one with us.

Q. You say he had his hands around your throat on that occasion?

A. Yes.

Q. How much force did he exert on that occasion?

A. Quite a bit. I did not lose consciousness.

Q. Were you able to breathe during the period of time he was choking you?

A. No.

* * * * * *

Q. What did you do when he was choking you?

A. Well, I taught myself how to relax. I would be real angry at first and struggle back and over several of these occasions and it seemed like when I relaxed he would let go.

Q. Were there any marks or bruises inflicted upon you on this occasion?

A. There were marks on my arms and red marks on my throat.

She testified that in December 1963, after having lunch at Sims Cafe in Dickinson, she walked to where her car was parked behind Schilla's Hardware store and discovered another car parked beside hers, with a man sitting in it; that it was very cold that night and, thinking there was something wrong with the man, she opened his car door on the passenger's side, got into the car, and shook him to arouse him; and that at about that time Mr. Gress drove up in his car, got into the car with her and the man, and beat them.

Her testimony in that regard follows:

A. He sat on me and I tried to get up and he bent me over the back of the seat and slapped me and hit me and strangled me. I asked this person to help me and he couldn't. He was not conscious and I asked Ray to stop.

Q. Did he exchange any words with your husband during this period of time?

A. I asked him to stop is all. There were no other words spoken by me.

Q. Did he say anything?

A. He said a lot of things in anger.

Q. What did he say?

A. I just can't remember exactly, called me lot of names.

Q. What happened then?

A. I finally got out of the car and he proceeded to beat on this man.

Q. This man appeared to be conscious?

A. This man was not conscious.

Q. And what did you do then?

A. I got in my car and went home.

She testified that in June 1961 or 1962 Mr. Gress became very angry with her while in their home; that she told him she was going to leave him and went downstairs to get her suitcases; and that Mr. Gress followed her downstairs.

She testified as follows concerning what occurred then:

A. He grabbed me and threw me on the floor and sat on me and he grabbed me around the throat and he pounded my head on the concrete floor, twice had my hands behind my back over my head. He bent my fingers back until one of them broke.

Q. Where did this break occur?

A. On my left hand.

Q. Was it a finger or hand that broke?

A. It was between a finger and a hand, the joint.

Q. The knuckle joint in other words?

A. Yes.

In connection with this incident she testified that Mr. Gress called Dr. Guloien the next morning, and that when the doctor came to the house Mr. Gress told the doctor that he did this because he loved her. She stated that as a result of this injury she had to have a cast on her hand for about six weeks.

She testified that she explained the injury to her hand by telling everyone that she fell down the stairs because she didn't want people to know what was going on in their house and in their life.

She also testified, without specifying the date, time, and place, that Mr. Gress had

beat, hit, and strangled her on other occasions, and that this placed her in fear of her life.

Mr. Gress's testimony in respect to the December 1963 incident is as follows:

\* \* \* I got into Dickinson, I was out in the country looking at some lambs. I was in the Bowman area that day. I got into Dickinson about 9:00 o'clock, went home, asked the babysitter where Dorothy was and she said at the bowling alley and I did not dismiss this babysitter at that time. I proceeded in getting out a little mail. At about 9:30, quarter to ten, I went down to mail this mail in the east box at the railroad depot. I could see Dorothy's car parked in front of the Main Bar. I walked in and her and Norrine were sitting at the bar on a stool, not in a booth, drinking beer. I joined them. I was thirsty, I was dry. I said, "I'd have one beer," and I said, "Dorothy, let's go home," and she said, "All right, as soon as we finish the drink." Then Norrine and her finished and we got up and walked out of the Main Bar together. Norrine did not have her car. Dorothy was to take her home. Immediately I went home, dismissed the babysitter and waited for my wife to come home. I waited until about 1:00 o'clock. I went home, dismissed the babysitter, waited until about 1:00 o'clock and no Dorothy. About 12:00 o'clock I called Norrine. She said, "No, Dorothy went home a long time ago. I had been in bed for two hours." At 1:00 o'clock I left the house, drove downtown and around town. I drove by all the liquor establishments. I did find my wife's car in the alley behind the Esquire or behind Schilla's Hardware. I also spotted C—— W——'s car at the Spur Bar. I parked in this alley waiting for my wife to return. At about 1:15 or 1:30, a big black Cadillac pulled up, parked directly alongside her car. I did not know at that time it was my wife, but I assumed this. I had reason to assume this because I had been told a few times prior to this deal about six months. I pulled

up behind this Cadillac and my wife's car, had them both fenced off. I blocked the alley directly so neither one could get out. I jumped into this Cadillac. I saw my wife in an embrace with C—— W——, one arm around her neck and the other one on her leg or knees or somewhere or maybe farther up. I got into the car and the first thing I did was pull the keys in the car and I asked the man his name. My wife said, "You will get in trouble, you will lose your job. Don't tell him anything." I said, "You don't have to tell me your name." My wife became very angry and I defended myself with an arm against her. I did push her head against the back seat. I did have to hold her and hurt her very bad and with this arm I fought C—— W—— off across her. I asked him a lot of questions. I asked him if he wanted to marry this girl and he said, "No," he just liked to play with her. I asked him if he was married and he said, "yes," he was married and had several children and didn't want this to get back. Every time he was going to stir, I hit him again. He was not passed out, he was plumb alive. There was open containers of beer in the car. There was cartons of beer in the car. This was a lie, she did not come from the establishment across the street, she pulled up in the car. And after about a half hour I gave C—— his keys and I went back. I told Dorothy to go home and immediately followed her home and that was the deal there. \* \* \*

Mr. Gress further testified concerning that incident as follows:

Q. What occurred immediately after the entrance of the two of you in the home?

A. There was an argument. She said first of all she was very angry. She said that I had no right to follow her and that it was none of my business what she done and that I was in the wrong by checking on her and after a while she was very intoxicated, very drunk and after a while she turned and

cried and said that she was sorry and said it was a mistake and that it would never happen again and it was an accident just too much to drink and this was an old friend of hers she had when she lived in Mandan years before.

Q. Did the two of you engage in a physical altercation.

A. No, not after we got home. We had our physical altercation in the Cadillac in the alley.

Q. When you were in the Cadillac car behind the garage, did your wife get struck?

A. I am sure she did.

Q. Where was she sitting in relation to you and Mr. W——?

A. She was in the center, C—— was behind the wheel and I was on the other side. And naturally I had to hold her down. She was a wildcat.

Q. After arriving home, did you strike · her?

A. No.

Q. Did you kick her with the cowboy boots?

A. No.

Q. Did you attempt to strangle or choke her?

A. No.

Q. Did you put your hands about her neck in any fashion?

A. I probably put my hands on her shoulders to hold her back. My arms are longer than hers and probably that's the way her clothes got tore. I don't know how far the neck goes, but if it's not shoulders, that's the neck. I wouldn't strike my wife.

Mr. Gress denied physically abusing his wife in any way on any other occasion and specifically denied physically abusing her in 1964 during his mother-in-law's visit.

As for the circumstances surrounding the incident which occurred in June 1961 or 1962 he testified as follows:

A. My wife went bowling that night, she did many nights, and I waited—she told me she would be home early, she always said that and she never did that.

MR. SWANSON: We object to all this extraneous editorializing by the witness. We think it's perfectly possible and obviously proper that this be conducted on a question and answer basis so we can eliminate this.

THE COURT: Your objection is sustained. The last part of that answer is stricken.

A. I waited for Dorothy to come home probably 12:00 or 12:30. I went to see where she was. I found her car in the alley behind the Esquire. I walked in and found her in a very intoxicated drunk condition dancing on the floor in a shameful manner, very disgusting. I took her by the arm and helped her out and said to go home. I walked right on the dance floor in the middle of the dance and took her by the arm and said, "Let's go."

Q. Well, did you then proceed home, Mr. Gress?

A. Yes.

Q. And what time did you arrive at home?

A. Probably quarter to one, 12:30, quarter to one, maybe right in there.

Q. And was your wife with you?

A. Just ahead of me.

Q. And you both went into the house on or about the same time?

A. Yes.

Q. What occurred between the two of you [when] you entered the home?

A. She was very angry. She said she was going to leave me. She said she

wanted a divorce. I said, "Dorothy, what about the children?" She said, "I don't care about those children, I must leave." She took off her coat. We talked for probably five minutes or so and argued. She said, "I am going down to pick up my suitcases and pack." She rushed to the basement and fell down those stairs. I picked her up at the bottom of the stairs and put her to bed and called a doctor the next morning.

Q. Now, did you, the two of you, engage in a physical altercation that night?

A. Possibly for five minutes or so. I was holding her back and maybe by the wrists. That's where the red marks come to stop her from clawing and striking and kicking in the groin and that.

Q. Did you hold her about the neck?

A. About the shoulders.

As for the March 3, 1965, incident, Mr. Gress testified that Mrs. Gress left home about 6:30 in the evening to bowl; that when she left he asked her to be home early; that at about 8:15 he received a telephone call from her; and that she said she was sorry that she could not come right home because they had a special bowling meeting, that she would stay at the Paragon and have a cup of coffee with M—— K—— and N—— E—— and some other members of their bowling league, and that it would probably be 10:00 or 10:30 or 11:00 before she could get home.

He testified that at about 9:15 on his way to the mailbox at the depot in Dickinson he saw his wife's car speeding on Highway 22; that he followed her; that she drove her car into the alley behind the Ray Hotel; and that he stopped and asked her to get into the car, but that she refused and said she wouldn't go into the hotel with him and that she was going home.

His testimony concerning what transpired when he reached home a short time later is as follows:

A. When I came into the house she already had her coat off. I met her in the living room. She said that she hated me, she wanted a divorce, that she was leaving me and I had no right to follow her downtown and I asked her about the meeting she was supposed to have at the Paragon and she said, "We changed our plans, I was to meet M—— and N—— at the hotel.

Q. Well, did the two of you engage in a violent quarrel?

A. She came out of the corner, she came at me striking and kicking. I did grab her, I did hold her. I tore her bowling shirt. I did hold her wrists.

Q. Did you strike her?

A. No.

Q. Did she fall on the floor?

A. Yes, she did. She fell when I released her. Maybe I possibly shoved a little bit when I released her. She did not pass out. I did not choke her. She did not fall because she was out of wind or anything.

Q. Did you kick her on that occasion?

A. No, I did not.

The only corroboration of Mrs. Gress's testimony that Mr. Gress physically abused her was the testimony of Dr. H. A. Guloien. That testimony is as follows:

Q. Did you have occasion to treat the plaintiff in May of 1963?

A. Yes. On May 13 of 1963, I saw Mrs. Gress at her home and she stated that her husband had beaten her on the night previously. This was a morning call and upon examination there was contusions of both eyes which were blackened. Complained of abdominal pain. There was no external signs of any injury to the abdomen so exactly the only external signs were two blackened eyes and Mrs. Gress' statement that these had been inflicted by her husband.

Q. Do you recall her appearance on that occasion, doctor?

A. As I have described it, depression with the two blackened eyes.

Concerning the March 3, 1965, incident, Mrs. Gress testified that, not wanting to mope around the house and feel sorry for herself, she purchased a blouse that covered her arms, covered her face with makeup, and went bowling; and that while she was having coffee after bowling, a Mr. W——L—— stopped by and asked her what happened. Her testimony in that regard is as follows:

Q. What did he have reference to, do you know?

A. He was looking at my face and neck. That's all that showed of me. It showed the bruises and then he noticed the real bad one down here on my wrist and hand and I made some flippant remark, I don't recall what it was, and he looked at me and he said, "Did your husband beat you?" And I don't know why I said it, but I said, "Yes." I don't know why I did. That's the first time I ever did it to anybody.

Viewing all of the evidence, the trial court concluded that Mrs. Gress had failed in her burden of proving extreme cruelty. In light of the contradictory testimony of the parties and of the fact that the witnesses appeared personally before the trial court, who had an opportunity to see and hear them testify and to note their demeanor and candor or lack of it, the trial court's findings are entitled to appreciable weight.

 In a decision rendered by this court in 1966 we said:

As this court has said many times, on a trial de novo the findings of the trial court are entitled to appreciable weight, especially when based on testimony of witnesses who appeared in person before the court. Pauly v. Haas (N.D.), 84 N.W.2d 302.

This statement was made many times by this court prior to the *Pauly* case, and has been repeated in many subsequent decisions. * * *
Parceluk v. Knudtson, 139 N.W.2d 864, 874 (N.D.1966).

In addition to finding that Mrs. Gress failed in proving extreme cruelty on the part of Mr. Gress, the trial court noted that all of the instances of cruelty alleged by Mrs. Gress were preceded by questionable and irregular conduct on her part and so were provoked by her. It was the trial court's view that provocation is a defense which nullifies grounds for divorce based upon acts resulting from it. It cited *American Jurisprudence* as expressing the general rule as follows:

*Provocation is a defense in a divorce action, in the sense that it deprives the offended spouse of the right to complain of the provoked conduct. It is accordingly held that a complaining party is not entitled to a divorce where he provoked and brought on the cruel treatment which he relies upon as a ground for divorce.* While the courts express their condemnation of a husband who beats and strikes his wife or otherwise commits violent acts upon her person, they hold that if her own conduct provoked the assaults she cannot obtain a divorce because of them or justify her separation from him upon such ground. The retaliatory conduct, however, may be out of all proportion to the provocation, in which event the provocation does not bar a divorce. * * * [Emphasis supplied.]

17 Am.Jur. Divorce and Separation § 201, at 392 (1957).

Mrs. Gress contends that the trial court erred in these conclusions. She asserts that the proper rule is as stated in *Corpus Juris Secundum*:

* * * The only justification for an assault by a man on his wife would be self-defense, and in such case the husband may use only such force which

to him seemed reasonably necessary as a prudent man acting under similar circumstances to protect himself from injury.

27A C.J.S. Divorce § 56(3), at 179–180 (1959).

It is also her view that if there was provocation, the retaliatory conduct was out of all proportion to the provocation.

We note that Mrs. Gress's reference is taken from that part of *Corpus Juris Secundum* which discusses the effect of excessive retaliation. The beginning sentence of that discussion states that provocation by a complainant will not justify nor excuse excessive cruelty or indignities disproportionate to the provocation.

■ In that respect we note that in a recent decision the Supreme Court of Montana held that it was for the trial court to determine whether sufficient provocation existed and whether the retaliatory action was out of proportion to the provocation.

Moreover whether sufficient provocation existed to provoke plaintiff into violent action was for the trial judge to determine, "having the opportunity to see and hear the witnesses, [he] is best able to ascertain whether the physical violence used was induced by the other spouse, or whether, under the circumstances, it was out of proportion to the provocation." Popescu v. Popescu, 46 Cal.App.2d 44, 115 P.2d 208, 212.

Bell v. Bell, 133 Mont. 572, 328 P.2d 115, 120.

■ We concur with the trial court in its conclusion that the general rule as stated by it is the correct rule and that it is applicable in this case. The conduct of Mrs. Gress, in drinking and dancing with other men in bars in Mr. Gress's absence until the late hours on numerous and quite regular occasions against his will, was certainly provocative.

■ We conclude that the evidence is insufficient to prove that Mr. Gress's conduct was out of proportion to the provocation. In this latter conclusion we give appreciable weight to the trial court's findings. We also conclude that Mrs. Gress failed to sustain the burden of proving extreme cruelty on the part of Mr. Gress.

The next issue we must consider is the sufficiency of the evidence to support the trial court's finding of the infliction of extreme cruelty on Mr. Gress by Mrs. Gress.

Here again we apply the rule that the trial court's findings are entitled to appreciable weight, especially when the parties have appeared before the trial court and have testified in person. It is our view that Mrs. Gress did inflict extreme cruelty upon Mr. Gress. The cross-examination of Mrs. Gress discloses that she participated in league bowling between three and four nights a week, on Monday, Wednesday, Thursday, and Friday, during the bowling season, which runs from September until April or the first part of May; that the Friday evening bowling was the mixed-couple league in which she bowled with her husband; that the sponsors of her teams were the Main Bar, the Ray Hotel, Canadian Club, and the Esquire Club; that on the evenings when she bowled and her husband was not at home, she left her two children with babysitters; that she usually left home between 6:30 and 6:45 in the evening and unless she bowled two shifts in the evening, her bowling was concluded about 9:15 or 9:30; that sometimes after bowling she would stop at the Ray Hotel or the Esquire Club to have one or two drinks, but that this would not normally occur more than twice a month; that when she did this, she would perhaps not get home until 11:00 or 12:00; and that sometimes, following bowling, she would go out with some of the other women on the team to the Esquire Club for steak, and on those occasions she would perhaps not get home until 1:00 a. m.

She disclosed that on occasion men would sit down in the bars with her and the other women and perhaps buy them a round of drinks, and that she may perhaps have inadvertently walked out of the bars with men other than her husband. She conceded that she had seen Mr. W—— L—— on a number of occasions; and that she had called him on the telephone to arrange to meet him about five blocks north of Main Street in Dickinson, her intended purpose being to warn him that Mr. Gress had told her that if he ever saw Mr. L—— with her again, he would kill them both, and she wanted Mr. L—— to realize that Mr. Gress was serious.

She testified that she did meet Mr. L—— at about 9:00 on the evening of April 24 at the appointed place and that she got into his car; that she talked about the situation between Mr. Gress and herself; and that they then drove out into the country and parked and talked for a few minutes. Her testimony in that respect reads as follows:

A. We were just driving and then I noticed that he had a sentry in his car like Ray had and he said it didn't work and I said Ray checked his with the radar station, to check his and he turned it on to get a signal. Then we drove back and we drove north for a while and then we drove west for a while. We sat there and talked for a few minutes and I had to make him see he was in trouble. He refused.

Q. You mean you drove off in some rural roads?

A. About half mile on a rural road.

Q. Off of Highway 22?

A. Yes.

Q. North of Dickinson?

A. Yes.

Q. About how far?

A. I don't know, wasn't very far.

Q. And you drove off about half a mile on this rural road and parked the car?

A. Yes.

Q. And the two of you were alone on that occasion?

A. Yes.

Q. And how long did you remain parked in that particular place, Mrs. Gress?

A. We were probably there 10 or 15 minutes.

Q. But you don't think any longer than 10 or 15 minutes?

A. It wasn't any longer.

Q. And all you engaged in at that time is conversation?

A. Yes, I was scared to death and I thought that he should be too. I didn't want—I was afraid. Ray told me he was going to kill us both and I thought he should know.

Q. Was it necessary to park the car out on a rural road to tell him that, Mrs. Gress?

A. We talked about the situation quite extensively. It was not necessary but we did.

Q. Had he become quite an old friend of yours by that time?

A. No, sir, I don't know him that well.

Q. Well, why did you take him into your confidence to talk about this situation?

A. He eventually got involved in this thing and I just—I felt real bad about it.

She testified that Mr. Gress said that she could bowl all she wanted to, but that he would like her to come home after she finished bowling; and that if he had asked her to please come home or had requested her in a nice way to do so, she would have,

but that "something set me off when he demanded of me and I deliberately stayed away." She said that her staying away was in defiance of his attitude.

Mr. Gress testified that Mrs. Gress returned to their home intoxicated two or three times a week over the preceding five years; that she arrived home at 12:00, 1:00, 2:00 o'clock, and sometimes much later; that she would be very sick when she arrived home, and that if he said anything there would be an argument; that when she arrived home, she spent a lot of time in the bathroom vomiting; and that on one occasion he observed her at the hotel, dancing with another man in such a manner as to cause him embarrassment.

Other witnesses testified to Mrs. Gress's late-night drinking, dancing, and being in the company of men other than her husband. Two babysitters, one 14-year-old boy and one 19-year-old boy, who stayed with the children at night when Mrs. Gress was out, testified that she was regularly out late at night and regularly received telephone calls from men; a barmaid testified that she observed Mrs. Gress in a bar in Wibaux, Montana, when Mrs. Gress danced and with another woman companion absented herself from the bar for approximately 45 minutes with two male bartenders; a male witness testified that in the year 1963 he observed Mrs. Gress enter bars alone at night in Dickinson and that on some of these occasions she drank liquor with him.

In light of the trial court's findings, which are entitled to appreciable weight, we conclude that the evidence does establish cruelty on the part of Mrs. Gress of a sufficient degree to justify the trial court's granting of the divorce to Mr. Gress.

We need not discuss at length the issue arising out of the fact that the trial court, over the objection of Mrs. Gress, admitted into evidence testimony on the part of a private detective who was licensed in the State of Montana but was not licensed in the State of North Dakota. Mrs. Gress contends that because he was not licensed in North Dakota, his testimony should not have been received in evidence.

As the evidence of the unlicensed private detective related only to what he saw in the process of trailing W—— L—— and Mrs. Gress, particularly on the night of April 24, and, as Mrs. Gress's testimony on cross-examination, taken before the detective testified, is for the most part to the same effect as the detective's testimony, his testimony may be completely disregarded without affecting the result.

As for the issue of adultery, without a lengthy discussion of the facts or of the relative law, we conclude that the evidence is insufficient to establish adultery on the part of Mrs. Gress.

Nevertheless, we conclude that the court was correct in granting custody of the minor children to Mr. Gress.

Our statute on custody reads as follows:

14-05-22. Custody of children.—In an action for divorce, the court, before or after judgment, may give such direction for the custody, care, and education of the children of the marriage as may seem necessary or proper, and may vacate or modify the same at any time.

North Dakota Century Code.

In a 1962 decision of this court, we said:

The determining consideration of the court in giving directions for the custody of the children should be the welfare of the children. [Citations omitted.] * *

Kucera v. Kucera, 117 N.W.2d 810, 815 (N.D.1962).

We believe that Mrs. Gress has demonstrated her lack of concern for her children by voluntarily, without necessity, leaving them with babysitters from 6:30 in the evening to as late as 2:00 in the morning

on numerous occasions while she engaged in bowling, drinking, dancing, and eating. Not only did she deprive the children of her care while absent from them, but of necessity she also reduced the quality of care she could give them during the day while she rested and recovered from her evenings of overindulgence. We have no assurance that she will conduct herself any differently in the future.

■ In support of her contention that she should be given custody of the childen, especially because of their tender years, she refers us to the following quotation from *Corpis Juris Secundum:*

> Unless a mother is shown to be unfit to assume such responsibilities, or unable to provide a suitable home, the courts are loath to deny her the custody of a very young child; * * *.

27B C.J.S. Divorce § 309(4), at 457–458 (1959).

However, the sentence quoted continues as follows:

> and the rule generally applied, which has been recognized by statute in some jurisdictions, is that all things being equal, preference is to be given to the mother in awarding custody of a child of tender years * * *.

It should be noted that we have no such statute. Further, we believe that the words "all things being equal" must be recognized as an important part of the rule. All things are not equal in this case.

■ Especially significant is a later part of the same text:

> The general rule as to preference to be given to the mother in the award of custody of young children, or so-called "tender years doctrine," is not, however, inflexible and applicable in every case merely because the mother has not been shown clearly unfit; and it has been said to be merely an aid to the court

or one facet of the basic principle that the best interests and welfare of the child are the controlling considerations. The general rule is qualified by the requirement that other things be equal, and, whether or not such rule has been recognized or affirmed by statute, the mother of a child of tender years is not entitled to its custody as a matter of law. Accordingly, such a child may be awarded to the father, in the discretion of the court, where the circumstances of the case require it for the child's best interests, or custody may be awarded to third persons, as discussed supra § 308c.

27B C.J.S. Divorce § 309(4), at 461–463 (1959).

Mr. Gress assured the trial court that he had made arrangements with a widowed aunt, who has raised her family, to move into his home and take care of the children. This arrangement may not be ideal, considering the difference in age between the aunt and the minor children, but then again it must be noted that the situation as it existed while Mrs. Gress was in the home and had the responsibilities of motherhood were not ideal, either.

The trial court has continuing jurisdiction in custody matters, and thus if conditions should change or if Mr. Gress should be unable to make proper arrangements for the care of the minor children, the trial court can, if necessary, make other arrangements for the custody of the children.

■ In a 1950 decision concerning custody of two minor children this court said:

> * * * In the matter of awarding custody of children a large discretion is vested in the trial court and its decision thereon will be interfered with only where there is an abuse of that discretion. Nelson, Divorce and Annulment 2nd Ed. 415; 2 Schouler, Marriage and Divorce, 6th Ed. 2033; Sjol v. Sjol [76 N.D. 336] 35 N.W.2d 797, 798. * * *

Henry v. Henry, 77 N.D. 845, 46 N.W.2d 701, 706–707.

In this case it is clear that the trial court's discretion was carefully and reasonably exercised. We conclude therefore that it is for the best interests of the children that they be in the custody of Mr. Gress at this time.

The judgment of the trial court is affirmed in all respects.

TEIGEN, C. J., and STRUTZ and KNUDSON, JJ., concur.

PAULSON, J., not being a member of the Court at the time of submission of this case, did not participate.