Kenneth A. HEGGE, Plaintiff, Appellant
and Cross-Appellee,

v.

Chris A. HEGGE, Defendant, Appellee
and Cross-Appellant.

No. 9138.

Supreme Court of North Dakota.

Dec. 17, 1975.

Nelson & Binek, Grand Forks, for plaintiff, appellant and cross-appellee; argued by William W. Binek, Grand Forks, and Joel Gilbertson, Senior law student.

Murray, Mack, Moosbrugger & Leonard, Grand Forks, for defendant, appellee and cross-appellant; argued by Timothy R. Geck, Grand Forks, and Bradley W. Berg, Senior law student.

SAND, Judge.

This is an appeal by the plaintiff, Kenneth Hegge, from a judgment of the district court of Pembina County granting a divorce to both the plaintiff and the defendant, Chris Hegge, on the ground of irreconcilable differences, and awarding alimony

to the defendant in the amount of $300 per month, not to exceed 48 months. The plaintiff alleges that the award of alimony by the trial court is a reversible error of law and that the trial court's determination of alimony in the amount of $300 per month is clearly erroneous. On a cross-appeal, the defendant claims the trial court erred by giving custody of their daughter, Rachael, to plaintiff, and contends she should have been given custody.

The parties were married on April 28, 1967, at Vancouver, Washington. At the time of their marriage the defendant was 19 years old and was a waitress at a cafe. The plaintiff was a graduate chemical engineer, aged 27. Two children were born of this marriage, Steven in 1968 and Rachael in 1972. Steven was killed in an accident in 1974. For the past two years the plaintiff has been the chief chemist in charge of quality control at the American Crystal Sugar refining plant near Drayton, North Dakota. He has an income of approximately $14,000 per year. The property holdings of the parties consist of a modest checking account, two older model automobiles, a pickup truck, together with household goods and furnishings valued between $1,000 and $1,500. There is little or no indebtedness.

After the parties were married, they lived in Portland, Oregon, for one week before the plaintiff left to take employment in Alaska. By mutual agreement, his wife remained in Oregon and joined him about four months later. They lived in Alaska for approximately three months, during which time she developed an extramarital relationship with another man, an associate of the plaintiff and a co-employee. In hope that her absence might terminate the relationship, she returned to Portland for a month. Some time in December of 1967 Kenneth also came to Portland and the parties sufficiently reconciled so that both returned to Alaska before Christmas. Within two weeks after her return to Alaska, however, the extramarital relationship with the same party was resumed.

In the middle or latter part of January 1968 she returned to Portland. Kenneth also returned to Portland after terminating his job in Alaska. He took his former job as a research chemist at the medical school of the University of Oregon. Steven, their first child, was born on October 18, 1968, at about the same time that the plaintiff started working as an instructor at the University. In the fall of 1969 the plaintiff obtained an assistantship at the University and entered graduate school. During the summer of 1970 the defendant had two affairs, one with a man whom the plaintiff described as a hippie and who was also a drug user. The defendant became pregnant by this individual. She obtained, and plaintiff paid for, an abortion, giving the reason that the child, having this type of father, would likely be deformed. Approximately a month after the abortion she left the home for a six-month period, whereupon plaintiff started a divorce action. During the first part of April 1971 a reconciliation was accomplished, just as the plaintiff was finishing his graduate work.

Upon resuming their marital status, they now decided that Portland, Oregon, like Alaska, might have a bearing on their marital tranquility. They moved to Menahga, Minnesota, where Kenneth served as instructor for a year. From there they moved to Drayton, North Dakota, in the summer of 1972 where Kenneth assumed employment with American Crystal. Rachael, their daughter, was born at Drayton.

It is suggested that during their stay in Menahga, and later when first at Drayton, that things were going well for them. Living conditions available at Drayton were not good. The defendant found it difficult to tolerate her role as a mother and housewife. Counseling was sought from the local pastor and from other professionals. Although Kenneth was critical of the way his wife maintained the home, and how she

cared for the children, there is other testimony that she was a good mother, showed affection for her children, and tried hard to make friends and to become a part of the community in which they lived.

In the early summer of 1974 the defendant again left for two or three days at a time. This absence was prompted by an extramarital affair with a bartender in East Grand Forks. It was during this period that their son, Steven, was killed, but her behavior was not responsible for the death. The defendant was home at the time. The death of her son was such a severe shock to her that while under sedation prescribed by a doctor she took an overdose of prescription pills. Later she threatened suicide unless she were permitted to leave. After this incident the marriage completely deteriorated. She left home and continued her association with the bartender at the Spud Bar in East Grand Forks, where she took employment as a cocktail waitress. Defendant testified that she makes approximately $130 per week at this job.

Kenneth then brought the action for divorce and Chris counterclaimed.

At the trial, Kenneth testified that his wife had had several extramarital affairs and that she had on occasion left the home, leaving him with the children, for periods ranging from weekends to a six-month period of absence.

The defendant complained that, because of the disparity in their academic levels, she felt inferior to her husband. She wished to go to school to improve herself, but the situation was never such that she could. Also, much was made of the plaintiff's inadequacy as a conjugal partner.

Because of these irreconcilable differences the plaintiff was granted an absolute decree of divorce from the defendant, and the defendant was granted an absolute decree of divorce from the plaintiff.

The complaint alleged extreme mental cruelty and irreconcilable differences. It asked for custody of the minor child, Rachael, with visitation rights to the defendant, and that the plaintiff be awarded the real and personal property. The answer consisted primarily of a general denial and a counterclaim alleging extreme physical and mental cruelty, as defined in § 14–05–05, NDCC, irreconcilable differences, and asked for the custody of the minor child, Rachael, with visitation rights for the plaintiff, and for alimony and child support "sufficient to meet the demands of the defendant and minor child." Both parties asked for an absolute divorce.

The trial court issued its memorandum of opinion, which concluded with the following language:

> "Counsel for the plaintiff is directed to prepare Findings of Fact, Conclusions of Law, and Order for Judgment in accordance with this Memorandum of Decision."

The findings of fact so designated, however, are very meager and recite basically only the uncontested facts in the action. Paragraph V provides as follows:

> "FOUND: That there has arisen between the couple such differences that are irreconcilable in nature."

Under the designation of "Findings of Fact" no findings were made appertaining to the custody of the child, nor were any findings of fact made as the basis for the division of the property or for alimony or support payments.

The conclusions of law substantially state that irreconcilable differences exist which are grounds for an absolute decree of divorce; that the plaintiff be awarded the care, custody, and control of the minor child, Rachael Hegge, subject to only reasonable visitation rights by the defendant; that each of the parties are awarded the personal property currently in his or her respective possession, including motor vehicles which each now possess; and that the

plaintiff shall pay to the defendant $300 per month "as and for alimony" beginning January 1, 1975, or as soon thereafter as defendant can make arrangements for attending or engaging in a legitimate training program, whether it be as a dental technician, secretary, or other trade, and that such payments toward her support, education, and maintenance, be for a period not to exceed 48 months or when defendant remarries, whichever shall occur first.

■ This Court, after having struggled with the question, now considers and treats the determination of custody of minor children, alimony, and the disposition of property in divorce actions basically as findings of fact subject to the "clearly erroneous" provisions of Rule 52(a), N.D.R.Civ.P. *DeForest v. DeForest,* 228 N.W.2d 919 (N.D.1975); *Filler v. Filler,* 219 N.W.2d 96 (N.D.1974).

In this instance the findings of fact made by the trial court under the heading "Findings of Fact" are in themselves inadequate to make a determination whether or not they are clearly erroneous as to the points of contention, namely, custody of the minor child, Rachael, and the alimony payment of $300. This Court has previously concluded that a finding of fact is not controlled by its placement or label, but rather by its content. *Jahner v. Jacob,* 233 N.W.2d 791 (N.D.1975); *Ferguson v. Ferguson,* 202 N.W.2d 760 (N.D.1972).

Neither of the parties, as permitted under Rule 52(b), N.D.R.Civ.P. moved to amend or make additional findings. Consequently, we review the findings of fact wherever located as they exist.

Rule 52(a), N.D.R.Civ.P. also provides:

". . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein."

■ Under this language the United States courts held that a memorandum of decision may be resorted to for purposes of determining the facts found by the trial court and that the filing of a memorandum of opinion is sufficient even though no separate findings of fact or conclusions of law were made. Even though this Court has previously stated that facts are to be found specially so as to enable the appellate court to obtain a correct understanding of the factual issues determined by the trial court, in the case of *DeForest v. DeForest,* 228 N.W.2d 919 (N.D.1975), and in *Ellendale Farmers Union Cooperative Association v. Davis,* 219 N.W.2d 829 (N.D.1974), to which we continue to adhere, we nevertheless believe that a memorandum of decision which recites the facts may be, and should be, used to determine what facts were found by the trial court where the findings of fact under the designation of "Findings of Fact" by the trial court are grossly inadequate. See *Bain v. United States,* 428 F.2d 508 (6th Cir. 1970), *cert. denied,* 400 U.S. 959, 91 S.Ct. 358, 27 L.Ed.2d 267. Rule 52(a), N.D.R.Civ.P. is adopted from the federal rule, and the federal construction and interpretation would apply here. We arrive at this conclusion even though the trial court, in its memorandum of decision, had directed the plaintiff to prepare findings of fact, conclusions of law and order for judgment.

The appropriate rule of law, statutory or case, which is frequently referred to as common law, must be applied and all pertinent evidence should be considered by the court in granting custody of minor children, in making disposition of property, or granting alimony awards.

Section 30–10–06, NDCC, which was still in effect at the time this cause of action and trial took place, as pertinent to the question here, provides as follows:

"In . . . awarding the custody of a minor, the court is to be guided by the following considerations:

"1. By what appears to be for the best interests of the child in respect to its temporal and its mental and moral welfare, and if the child is of sufficient

age to form an intelligent preference, the court or judge may consider that preference in determining the question; and

"2. As between parents adversely claiming the custody or guardianship, neither parent is entitled to it as of right, but other things being equal, if the child is of tender years, it should be given to the mother, and if it is of an age to require education and preparation for labor or business, then to the father."

■ This Court has consistently held that custody of minor children should always be in accordance with the best interests of the child. The best interests of the child are the first and paramount consideration to be given in determining custody. The interest of the parent or parents may be important, but only to the extent that such interest has a bearing on the best interests of the child. *DeForest v. DeForest, supra; Bryant v. Bryant,* 102 N.W.2d 800 (N.D.1960).

■ The trial court in its memorandum of decision regarding the custody of the minor child, Rachael, found as a fact that the promiscuous activity of the defendant and the fact that she had left her children on occasions without hesitation several times "demonstrates an immature, irresponsible adult who is unable to carry out the duties necessary for proper influence and parental guidance of a growing child." The court further found

"That the plaintiff, even with all the inadequacies which the defendant [not the court] finds in him, has never overtly failed his children nor has he done anything to embarrass or disgrace them. . . . As between something less than the ultimate in cleanliness and sanitation and the exposure to immoral and indecent living, this Court will not hesitate to prefer the former over the latter."

The court added, "To fail to do so would hardly be in the best interest of the child."

In examining the evidence and testimony, we are satisfied that these findings of fact are amply supported by substantial evidence and are therefore not clearly erroneous.

This Court, in *Gress v. Gress,* 148 N.W.2d 166 (N.D.1967), upheld the custody of the minor child to the father on the grounds that the wife left the child frequently with babysitters in the evening, as late as two o'clock in the morning, while she engaged in bowling, drinking, dancing, and eating, and thus she deprived the children of her care while absent from them, and her activities also reduced the quality of care she could give them during the day while she rested and recovered from her evenings of overindulgence.

We believe the evidence clearly discloses that the best interests of the child were served by awarding custody of Rachael to the father and would continue to be served by affirming such custody. In arriving at this conclusion we are satisfied that the evidence does not establish "all things being equal," as stated in § 30–10–06 NDCC. They are not equal in this case, as the trial court observed and found in its memorandum of opinion. See also, *Ferguson v. Ferguson,* 202 N.W.2d 760 (N.D.1972).

The plaintiff contends that the trial court erred in allowing alimony to the defendant at the rate of $300 a month for a period not to exceed 48 months.

The trial court made no specific findings of fact on this matter. The memorandum of decision contained the following regarding alimony:

"It is further provided that for a period commencing January 1, 1975, or as soon thereafter as the defendant can arrange to engage in a legitimate training program, whether it be as a dental technician, secretary, or any other trade or occupation, the plaintiff will pay the sum of $300.00 per month towards her support, education, and maintenance, such pay-

ments to extend for a period not to exceed 48 months or until the defendant remarries, whichever shall occur first. Monthly payments provided for under this determination shall be made on or about the 1st of each month and shall be transmitted to the defendant at her residence or post office address as furnished to the plaintiff.

"It is the intent of this disposition that at the conclusion of not to exceed 48 months from and after the first payment herein provided that the defendant shall have had the benefit of sufficient training to be self-supporting and that all payments in lieu of support, maintenance, or alimony shall terminate."

The trial court gave no factual basis, other than as stated above, nor did it explain or give any reason for allowing alimony; neither did it reveal the rationale relied upon by the court for its order and judgment.

Section 14–05–24, NDCC, relating to alimony and division of property, provides as follows:

"When a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper, and may compel either of the parties to provide for the maintenance of the children of the marriage, and to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively. The court from time to time may modify its orders in these respects."

■ Even though § 14–05–24 does not mention fault or misconduct of the parties as being significant, case law or common law of this State does consider fault or misconduct as significant and important on the question of alimony.

■ After taking into account the statutory changes or amendments relating to grounds for divorce, it becomes readily apparent that the grounds upon which the divorce was, or is, actually granted are not necessarily controlling on the questions of child custody, alimony, or disposition of the property. As to these items the court must base its decision on facts that are pertinent to the issues and the laws that apply, including case law.

■ While this Court, on the question of dissolving the bonds of matrimony, on occasion may be interested only in hearing the de minimis evidence to establish irreconcilable differences where that is alleged as a ground, nevertheless, as has been pointed out earlier, where the question also involves custody of the children the court is, or should be, interested in the evidence which discloses the best interest of the children. Similarly, where the question of alimony and division of property is involved the court is interested in other evidence relative thereto. All of the evidence may be supportive, compatible, or supplemental, whichever the case may be. In determining whether either party is entitled to alimony the trial court may consider the respective ages of the parties; their earning ability; the conduct of the parties during the marriage and its duration; their station in life; their health and physical condition; the necessities of the parties and their circumstances, financial or otherwise; the value and income-producing capacity of the property and whether it was accumulated before or after marriage, the efforts and attitude of the parties towards its accumulation; and such other matters or facts as may be material. *Larson v. Larson*, 234 N.W.2d 861 (N.D.1975); *Ferguson v. Ferguson*, 202 N.W.2d 760 (N.D.1972); *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966); *Dahl v. Dahl*, 97 N.W.2d 844 (N.D.1959); *Anderson v. Anderson*, 68 N.W.2d 849 (N.D.1955).

This Court, in *Anderson v. Anderson, supra*, quoted approvingly from the case of *Heath v. Heath*, 103 Fla. 1071, 138 So. 796, 797, 82 A.L.R. 537, where the court upheld

an award to an adulterous wife where it appeared that the wife's services and her invested capital contributed to the value of the husband's business properties. But, in so doing, the Florida court said:

"Such an allowance is not alimony and should never be made in any case unless shown to be warranted by special facts and circumstances which support a finding of an equity in the husband's property arising in favor of the wife from contributions of funds and services made by her toward its accumulation over, above, and beyond the performance of ordinary marital duties toward the husband."

■ In the *Anderson* case this Court said that where a husband obtained a divorce on the ground of adultery and it appears the wife voluntarily left her home and thereafter chose to live with a paramour rather than return to her lawful husband, she is not entitled to permanent alimony. This rule of law has not been changed and still constitutes the case law in North Dakota. The significance of this ruling is not that the divorce was obtained on the grounds of adultery but that the party was guilty of adultery and voluntarily left the home which constituted grounds for reversing the alimony award.

In *Anderson* this Court reversed a $2,000 alimony award to the wife on the grounds that it was neither justifiable nor equitable upon the granting of a divorce upon the grounds of the wife's adultery. The case law, as established in the *Anderson* case has full application to the instant case.

"Where the statutes are sufficiently broad to permit an award of permanent alimony to a wife who is divorced for any reason, the courts theoretically have the power to award alimony to a wife who is guilty of adultery, but it has been held that the court should deny alimony to an adulterous wife. It has been said that the allowance of alimony to a wife who had deserted her husband to live with her paramour would be against public policy

and contrary to justice." 24 Am.Jur.2d *Divorce and Separation* § 623, p. 745.

We agree with this.

In oral argument before this Court it was contended by the defendant that the alimony award was warranted because the wife had in some measure contributed to the husband's education, specifically his attainment of a Master's Degree. It was argued that the wife should be recompensed for this contribution to the marriage.

Kenneth entered graduate school in the fall of 1969 and graduated in the spring of 1971. The only financial contributions made by Chris during this period were from a job as a sales clerk at Montgomery Ward during the 1969 Christmas season. Chris admitted that during the summer of 1970 she had two affairs, one of which resulted in her becoming pregnant and having an abortion in August of 1970, paid for by Kenneth. A month or two after the abortion Chris left home and was gone for six months, returning shortly before Kenneth's graduation. During this period of Chris' absence, Kenneth cared for their two-year-old son, Steven, while supporting the family and attending school.

It was suggested by the defendant that she had a desire to further her education but could not do so because of marital responsibilities and because the plaintiff, Kenneth, refused to help in this respect. Kenneth stated he did not refuse or deny her the right to attend school but that at certain times it was not economically permissible. A careful examination of the evidence relating to the entire period involved discloses that the actual opportunities to attend a school to improve her education were severely limited because of the moving, which was to a great degree the result of her extramarital activities. The evidence further discloses that her desire to acquire more education was not seriously put forth or, for that matter, seriously entertained. Her behavior during the period

of marriage is not consistent with a desire to acquire further formal education. The testimony of the defendant, Chris, discloses that she checked into WIN and SETA governmental programs and found that she could qualify for financial aid if she had custody of the child.

The trial court in its memorandum of decision did not make any findings that Chris has abandoned her husband. Nevertheless, evidence relating to this matter may not be overlooked.

During the summer of 1974 Chris began spending weekends away from home. In the latter part of July their son, Steven, was killed in an accident. Following this accident Chris took an overdose of pills and spent that night in the hospital. The next day she left home and went to Grand Forks. She returned the next evening for the funeral, but left the following day and has not spent a night at the home since then. She lived in an apartment and occasionally her paramour spent the night with her. She returned the first week of August with her boyfriend to pick up her things. At the time of the trial, Chris had again moved and was living in another apartment in East Grand Forks, in which city she was working in a bar, while Kenneth remained at his employment in Drayton taking care of Rachael.

The facts in this case establish and support a finding of abandonment or its equivalent. Even though the complaint did not allege desertion or abandonment, this is an item that cannot be disregarded where evidence establishing it has been introduced. Equity demands it.

This Court, in *Anderson v. Miller's Fairway Foods*, 225 N.W.2d 579 (N.D.1975), said that a finding is clearly erroneous although there is evidence to support it when the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. See also *Jahner v. Jacob*, 233 N.W.2d 791 (N.D.

1975). We believe the trial court made a mistake.

This Court, in *Larson v. Larson*, 234 N.W.2d 861 (N.D.1975), found a support payment award clearly erroneous where the trial court did not sufficiently weigh the needs of the father with the needs of the children and the maintenance of the family home, and modified the support award. In the *Larson* case this Court took into account the earnings of the respective parties. In the instant case Chris is employed and is earning, with tips, approximately $500 a month. The husband maintains the support of the child, and Chris, the defendant, has no obligation towards supporting the child or in maintaining a home other than for herself. This would serve as additional grounds for declaring the award of alimony clearly erroneous. Kenneth also argued that the trial court should have taken into account the provisions of § 14–07–11, NDCC, which provides as follows:

"A husband abandoned by his wife is not liable for her support until she offers to return, unless she was justified by his misconduct in abandoning him, nor is he liable for her support when she is living separate from him by agreement, unless such support is stipulated in the agreement."

He contended that even though this section addressed itself to the relationship of husband and wife, it nevertheless serves as a guide for purposes of determining whether or not alimony should be awarded in a divorce proceedings. We find it difficult to accept as a matter of law that the husband owes a greater duty to a wife upon divorce than the law had imposed upon him during the marriage. The action of the trial court resulted in the imposition of such duty. We therefore conclude that the findings of the trial court directing the payment of alimony at the rate of $300 a month for a period of 48 months, as provided for in paragraph V of the judgment and decree of divorce is erroneous and is not in

accordance with applicable law, and is, therefore, reversed. It is our view that Chris should receive no alimony under the circumstances here present. The case is therefore remanded with instructions to the trial court to modify the judgment consistent with this opinion.

No cost allowed to either party.

ERICKSTAD, C. J., and PEDERSON and PAULSON, JJ., concur.

VOGEL, Justice (dissenting).

I dissent because I am not "left with a definite and firm conviction that a mistake has been committed" by the trial court. I fear a mistake is being made by the majority.

The Hegge marriage was star-crossed from its inception. The husband was 26 years old, a college graduate with two bachelor's degrees, and employed as a research chemist. The wife was 19, working as a waitress, and a high school graduate. She had started a course intended to train her to become a dental assistant. Upon marriage, she dropped her plans for education, but never lost her desire for education. Because of a lack of funds, pregnancies, small children, and distance from educational institutions at various times, she was unable to pursue her education, even in the area of hobbies. Her husband once refused to let her take a 13-dollar knitting course. For years, the parties have had little or no communication, sexual or otherwise. Such social life as the wife had, including church activities, she had to arrange for herself. Her husband had none.

Nine years after marriage, the marriage a shambles, one child dead and the other taken from her, the wife has no marketable skill, except as a barmaid. Without alimony she could not afford to go back to school to learn to be anything but a barmaid.

True, she is greatly responsible (perhaps entirely responsible, although I doubt it) for the breakup of the marriage. But she has made some contributions to her husband's career. She took care of the children—all the witnesses admitted that she was a good mother except for her absences, and even while absent she made sure that a babysitter or her husband would be at home to care for the children. She worked for about six months during the marriage, at wages up to $700 per month. She cooked her husband's meals and took care of the houses in which they lived. It was not her fault, any more than his, that they were incompatible.

The only substantial asset acquired by either party during the marriage is the increased earning power of the husband. It cannot be sold for a lump sum, but it has a great value.[1] The wife contributed to its acquisition. There is nothing unfair about requiring him to make a reciprocal contribution toward her acquisition of a similar asset.

In an enormously difficult situation, I think the trial judge made a wise determination. If this court were to sustain his decision, as I think we should, the wife could go to school and make something of her shattered life. The husband, who has the earning ability to do so, could assist her for four years without great hardship and then be free of obligation. The decision of the majority of this court, reversing the award of alimony, probably will have the effect of depriving her of any further education and forcing her to continue in her present employment.

Alimony or installment payments on property settlements during the period

---

1. According to Table 22, *Digest of Educational Statistics* (1974), entitled "Annual Mean Income, Lifetime Income, and Educational Attainment of Men in the United States for Selected Years 1956–72," the mean lifetime income of a 1972 male college graduate will be $711,000, while the mean lifetime income of a male with one or more years of graduate work will be $824,000.

when an ex-wife trains herself for a better-paying occupation is not a new idea. *Morgan v. Morgan,* 81 Misc.2d 616, 366 N.Y.S.2d 977 (1975); *Gregg v. Gregg,* 193 Neb. 811, 229 N.W.2d 546 (1975). We approved a stipulation of the parties containing such a provision in *Moran v. Moran,* 200 N.W.2d 263 (N.D.1972), although the opinion refers to it only obliquely.

I would decline to follow the harsh ruling of *Anderson v. Anderson,* 68 N.W.2d 849 (N.D.1955), cited in the majority opinion. Although it might be distinguished on the basis that the appeal in *Anderson* was heard de novo, while in the present case we must hold that the findings of the trial judge were clearly erroneous in order to reverse (and in *Anderson* the husband had supported the three children of his wife by a former marriage, a factor we do not have here), I would prefer to simply abandon the *Anderson* rule. It is an anachronism in today's world. Furthermore, it is based primarily upon the holding in a Florida case, *Heath v. Heath,* 103 Fla. 1071, 138 So. 796, 82 A.L.R. 537 (1932), which was compelled by a Florida statute—a statute which we do not have in this State. The statute dates back to 1828 [see dissent of Justice Roberts in *Pacheco v. Pacheco,* 246 So.2d 778, 782–783 (Fla.1971)], a time when wives were considered as scarcely better than chattels.

Since the *Anderson* case was decided, we have held at least twice that our power to grant property divisions and alimony exists regardless of which party is at fault. *Halla v. Halla,* 200 N.W.2d 271 (N.D.1972), and *Agrest v. Agrest,* 75 N.D. 318, 27 N.W.2d 697 (1947). I would adhere to this rule and jettison the rule of *Anderson.*

In its place, we should adopt the rule I have suggested above and hold that among the factors to be considered by the trial court in granting a property division or alimony are the relative earning power of the parties, the contribution of the wife toward any increased earning power of the husband during the marriage, and their relative economic position after divorce. This approach is supported by more modern decisions. In *Diment v. Diment* (Okl.Ct.App. 1974), 531 P.2d 1071, 1073, the court stated:

"Without this award, [the wife] would be left with nothing to show for her contributions, financial or otherwise, to approximately eighteen years of marriage, which enabled the [ex-husband] to acquire a valuable college and medical school education that has greatly enhanced his earning capacity."

In *Morgan v. Morgan, supra,* the court balanced many factors, including the parties' financial status, their obligations, their ages, stations in life, and opportunities for development and self-fulfillment, and held that a wife who had dropped out of college to support the family while the husband finished his undergraduate work and law school was entitled to alimony while she resumed her education, instead of requiring her to go back to work as a secretary.

In *Wintermyer v. Wintermyer,* (Okl.1975), 1 Family Law Reporter 2388, 2389, the court put great weight on the fact that the husband had

"a valuable skill and a financially rewarding career. He [had] an earning capability of a minimum of $32,000 per year and a maximum of about $45,000 per year. She [had] little skill with an earning capability of $4,800 per year."

The court found that both parties had worked hard and each had contributed in his or her own way to the marriage.

In *Parsons v. Parsons,* 68 Wis.2d 744, 229 N.W.2d 629, 634 (1975), the Wisconsin Supreme Court held that the contribution of a full-time homemaker-housewife to a marriage is as great as, or greater than, that of a wife employed outside the home.

As I have said, I believe the trial court in the present case made an entirely proper disposition of a difficult matter. I believe there was no error, clear or otherwise. I

would affirm both the placement of custody in the father and the award of alimony to the mother. Since the majority reverses the trial court on the award of alimony, I dissent from that reversal.